In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1929

KENNETH KIDWELL,

*Plaintiff-Appellant,*

*v.*

JOSEPH S. EISENHAUER, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 09 CV 2179—**Michael P. McCuskey**, *Judge.*

ARGUED JANUARY 6, 2012—DECIDED MAY 22, 2012

Before MANION and WILLIAMS, *Circuit Judges,* and
CASTILLO, *District Judge.**

MANION, *Circuit Judge.* Over the course of six months,
Appellant Kenneth Kidwell, a sixteen-year veteran of the
Danville, Illinois police department, publicly criticized
several departmental officials at two police officers'

* The Honorable Ruben Castillo, of the Northern District
of Illinois, is sitting by designation.

union meetings. Roughly during that same time period, Kidwell also committed several violations of departmental policy and was punished accordingly with, among other things, a written reprimand and a two-day suspension. Then, after Kidwell failed to clear a fitness-for-duty evaluation, the department officials filed termination charges against him. The matter was assigned to arbitration where he was suspended but not terminated. Ultimately, Kidwell brought this suit under § 1983 against Danville's mayor and several department officials, alleging that the actions taken against him were in retaliation for the criticisms he voiced at the two union meetings. The district court held that Kidwell could not make out a prima facie case for retaliation and therefore granted summary judgment in favor of the defendants. We agree with the district court's conclusions, and thus affirm.

## I.

Kenneth Kidwell has been a police officer for the city of Danville, Illinois since December 1992. In 1996 he was promoted to sergeant, a rank that he still holds. As a sergeant, Kidwell was a second-shift patrol supervisor. In addition, on January 1, 2006, Kidwell was assigned the collateral duty of supervising the Community Oriented Policing Service ("COPS") Unit. The COPS Unit, which was composed of Kidwell and two other officers, was assigned to periodically patrol the Danville housing projects and assist with certain police investigations.

In March 2007, Defendant Doug Miller, a deputy director of the police department, received a call from an anonymous source who informed Miller that Danville gang members were planning a hit on two police officers. As the supervisor of the COPS Unit, Kidwell became involved in investigating this threat. After a period of time, Kidwell became displeased with the police department's progress, so he took it on himself to dig further into the investigation.

As part of this supplemental investigation, Kidwell cultivated a relationship with a confidential informant. Subsequently, the confidential informant was arrested for battering a woman and was jailed with a high bond. In December 2007, Kidwell approached an assistant state's attorney to request that the attorney talk to the judge about lowering the bond amount so that Kidwell could continue to work with the informant on the police assassination investigation. The attorney apparently agreed to seek a reduction of the bond amount. A few weeks later, Kidwell again met with the assistant state's attorney who told Kidwell that the judge had refused to lower the bond amount. So Kidwell personally met with the judge who apparently told Kidwell that the assistant state's attorney had never requested that the informant's bond amount be lowered. After Kidwell explained that the informant was helping him investigate a police assassination plot, the judge agreed to lower the amount of the bond. The state's attorney's office was upset that Kidwell had surreptitiously discussed the lowering of the informant's bond with a judge and complained to Defendant

Larry Thomason, Director of Danville's Public Safety Department. Concerned about the future of the relationship between the police department and the state's attorney's office, Thomason initiated an investigation into Kidwell's actions. Although Kidwell was found not to have violated any police department rules, the department nevertheless changed its policy to forbid such backroom dealings with judges in the future.

Kidwell's first purported act of protected speech occurred soon thereafter, and a tumultuous year and a half ensued. On February 11, 2008, Kidwell and another officer made a joint presentation at the Police Benevolent and Protective Association (the "union") meeting, expressing concern about the department's failure to follow through on the police assassination investigation. Kidwell also relayed the aforementioned incident where the assistant state's attorney had lied to him about attempting to have the confidential informant's bond lowered. Finally, Kidwell brought up the prospect of the union holding a no-confidence vote against the police department administration and the mayor. That vote apparently never occurred.

Next, on April 2, 2008, Kidwell approached Defendant Bob Richard, a deputy director of the police department, concerning an internal investigation Richard was conducting on a fellow officer, Tony Piatt. Kidwell asked Richard—while Piatt was within earshot—"Why are you headhunting him?" On April 15, pursuant to departmental rules and regulations, Richard issued Kidwell a "Written Reprimand at Division Level" for Kidwell's public headhunting comment.

Later in April 2008, Richard received word that Kidwell had been meeting with informants in Kidwell's personal vehicle while on duty and without anyone in the police department's knowledge. Concerned for Kidwell's safety, Richard instructed a police commander, John Miller, to meet with Kidwell and direct him not to meet with informants alone without first telling someone in the department. On May 1, 2008, Miller relayed the directive to Kidwell and emphasized that the directive was put in place out of concern for Kidwell's safety. Kidwell denied (and continues to deny) that he had met with informants in his personal vehicle while on duty. He contends that this policy was instituted solely for him.

On May 23, 2008, Richard informed Kidwell that the COPS Unit, which Kidwell supervised, was being combined with another unit named the Problem Oriented Policing ("POP") Unit. Formed in June 2007, the POP Unit consisted of one sergeant and three officers and was organized under the police department's criminal investigations section. The record is not clear on how the COPS and POP Units were different, but it is apparent that they had overlapping roles. As Thomason put it, both units assisted detectives and shared resources. Thomason apparently was seeking to find a way to combine the COPS and POP Units beginning in June 2007 (the inception of the POP Unit), as the department was hit with economic and manpower constraints in the beginning of 2008. Thomason became further convinced that it would be a more efficient use of both resources and manpower to combine the two

units under the investigations section. Specifically, because the patrol section was in need of more command personnel, combining the two investigation units had the effect of freeing up Kidwell to focus more on his supervisory role in the patrol section. And so the units merged and the COPS Unit was placed under the leadership of the POP Unit sergeant and the investigations section. Kidwell's leadership position was thus eliminated, and on June 25, 2008, Richard ordered Kidwell to turn in his COPS Unit-issued cell phone.

On August 8, 2008, Kidwell attended another union meeting where he engaged in another purported act of protected speech. Kidwell complained that Richard had interfered with a grievance that Kidwell had filed and had otherwise been acting contrary to the union's policies. Kidwell thus argued that Richard had a conflict of interest and asked that Richard be removed from the union. Kidwell was the primary presenter at this meeting, and Thomason, Richard, and Doug Miller were all in attendance.

On August 26, 2008, a little more than two weeks after the second union meeting, Kidwell received a call from the same confidential informant who had been helping Kidwell with the police-assassination investigation. The informant told Kidwell that he was in Chicago and in possession of an explosive device; he asked Kidwell to travel to Chicago so that the informant could turn the device over to Kidwell. So Kidwell traveled to Chicago in his personal vehicle without telling anyone in the police department (a trip

of at least 120 miles one way), and took a civilian with him. On arrival, Kidwell discovered that the explosive device was actually a piece of firework. Confident that it would not explode in transit, Kidwell carried the device in his trunk back to the Danville police department. After returning to the department, Kidwell informed Richard that he had an explosive device in his trunk, and Richard directed Kidwell to call the bomb squad. Kidwell did so and was instructed to drive the device over to Ogden, Illinois, approximately 15 to 20 miles away, to turn it over to the bomb squad.

When Thomason learned of this episode, he was concerned about several aspects of Kidwell's conduct. Among those concerns was the fact that Kidwell had gone out of the police department's jurisdiction without notifying either his own chain of command or the Chicago police department, and that Kidwell had also potentially placed a civilian in danger. Thomason therefore called a meeting with Kidwell, who recounted the details of the trip, corroborating the information that Thomason had received. Thomason then informed Kidwell by memorandum that Kidwell was in violation of several departmental rules, and as punishment Kidwell was suspended for two days on September 17, 2008.

On the same day that his suspension began, September 17, 2008, Kidwell transported the same confidential informant to Burlington, Iowa, ostensibly so that the informant could receive medical treatment from a recent gunshot wound (the informant apparently had

family in Burlington and felt more comfortable receiving treatment there). Curiously, the informant sustained this wound while at a gas station in Burlington. Notably, the informant was a convicted felon whose bond restrictions prohibited him from leaving the state of Illinois without prior approval. Once in Burlington, Kidwell purchased a disposable camera and took some pictures of the gas station where the informant had been shot. He also inquired about the gas station's security video footage. Kidwell denies that this activity amounted to any sort of police investigation, claiming that he did not take any notes, cite names of individuals, or recover any shell casings.

The Burlington police department thought differently. The same day that Kidwell and the informant traveled to Burlington, Richard received a call from a Lieutenant Kramer at the Burlington police department, asking if an officer named Kidwell had been authorized to conduct an investigation in Iowa. Kramer relayed that Kidwell had gone to a gas station where a shooting had occurred, showed his Danville police identification, asked questions, and inquired about videotapes. Kramer conveyed his concern that Kidwell was interfering with an active investigation and noted that, if Kidwell continued, he could be brought up on criminal charges.

Richard passed on this information to Thomason, who, after Kidwell returned to Danville, spoke briefly with Kidwell about what had occurred and then told Kidwell that the Burlington police department had

voiced its concern. Thomason believed that Kidwell had violated departmental policy by implying that he was conducting an investigation in Burlington without letting the Burlington police department know in advance. (Kidwell states that he did in fact let the Burlington police know of his presence—but he did so only after he had left town and was made aware that the gas station manager might be complaining about his actions.) Additionally, Thomason believed that Kidwell had violated policy by fraternizing with a felon and aiding that felon's violation of his bond restrictions by taking him across state lines. Kidwell was not immediately punished for his actions, however, and after he had served the remainder of his two-day suspension he returned to duty.

But only a few days later, on September 21, 2008, Kidwell was involved in a car accident while on duty. During a high-speed chase that involved several officers, Kidwell was making a three-point turn on a highway when he was broadsided by a squad car driven by another police officer. Both Kidwell and the police officer who hit him suffered serious injuries, and there was extensive property damage done to several vehicles. Detective Stark, a Danville police department officer who was off duty at the time, witnessed the accident and reported to Thomason his version of the events. Based on that report, Thomason decided to have Stark head the ensuing investigation into how the accident had happened.

The Danville Police Department Policy Manual states that, "[w]henever a police vehicle is involved in a vehicle

accident which involves death, serious injury, or major property damage, the on duty supervisor will request the accident to be investigated by either the Vermilion County Sheriff's Department or the Illinois State Police." Thomason's appointment of Stark to head the investigation thus ostensibly violated this policy, which requires the appointment of an outside agency when serious accidents occur to avoid the appearance of impropriety. Thomason, however, stated that he interprets the policy to require outside agency involvement only if there is a death that results from an accident between a police department vehicle and a civilian vehicle. Because there were no deaths and the two main vehicles involved in the accident belonged to the department, Thomason saw no need to appoint an outside agency to head the investigation. The police department's Vehicle Accident Damage Review Committee, composed of one command officer and four to five other department members, subsequently found that Kidwell was at fault in the accident. Although not immediately disciplined for his part in causing the accident, Kidwell was out of work for the next several months due to his injuries sustained during the crash.

Kidwell was still off of work and recovering from his injuries when, on January 12, 2009, he informed the police department that he was taking the prescription drugs Lexapro and Abilify. Kidwell stated that he began taking Lexapro in 2007, and Abilify in November 2008, to treat obsessive-compulsive disorder. Kidwell disclosed this information, albeit belatedly, because under departmental policy police officers must

disclose to their supervisors when they are taking medication. As a result of Kidwell's medication disclosure, on January 26, 2009, Thomason ordered Kidwell to undergo a fitness-for-duty evaluation at the Institute for Public Safety Personnel, Inc., located in Indianapolis, Indiana. Thomason's written order stated that the reasons for the evaluation were Kidwell's "increasingly changed behavior over the last year," and Kidwell's disclosure that he was taking Lexapro and Abilify.

As ordered, Kidwell submitted to the fitness-for-duty evaluation on January 29, 2009. The next day, Thomason placed Kidwell on administrative leave, citing as his rationale the fact that Kidwell was undergoing a fitness-for-duty evaluation. Dr. Darren Higginbotham performed Kidwell's evaluation and, on February 6, 2009, informed Thomason that Kidwell was unfit for duty. Thomason then placed Kidwell on leave for a non-duty-related illness.

Kidwell had to be found fit for duty before he could resume his police duties. Therefore, Thomason sought to have Kidwell take another fitness-for-duty evaluation, but Dr. Higginbotham refused to work with Kidwell any further because of a dispute that occurred when Kidwell's worker's compensation attorney subpoenaed Dr. Higginbotham for his records. Thomason eventually ordered Kidwell to submit to an evaluation with Dr. Michael Campion on May 29, 2009. Kidwell initially complied with this order, but was concerned with what he believed to be an overly broad medical release waiver, so he withdrew his consent to have the evaluation (along with all of his medical records) turned over

to the police department. The union informed the police department of the reason for Kidwell's consent withdrawal, and itself expressed concern that the broad medical release violated Illinois law.

Defendant Scott Eisenhauer, Danville's mayor, eventually sought to have Kidwell terminated. Accordingly, on September 14, 2009, Thomason filed charges seeking to discharge Kidwell for insubordination because Kidwell had disobeyed a direct order to release Dr. Campion's report to the police department. Thomason also sought Kidwell's termination because of Kidwell's violation of departmental policy during his trip to Burlington, Iowa and during the high-speed chase the previous year. The union filed a grievance on Kidwell's behalf, challenging the grounds for termination. The arbitrator assigned to the matter eventually found that there was no just cause for termination and that a seven-day suspension was warranted for Kidwell's actions during the Burlington incident and the high-speed chase accident. Moreover, the arbitrator found that Kidwell was not insubordinate for refusing to sign Dr. Campion's broad medical consent form. Although she ultimately ordered that Kidwell be reinstated, the arbitrator conditioned his continued employment on a fit-for-duty determination made by another doctor. Kidwell apparently remains employed by the police department but his exact status is unclear from the record.

In addition to the administrative proceedings, Kidwell filed this suit under 42 U.S.C. § 1983, alleging that Mayor Eisenhauer, Director Thomason, and Deputy

Directors Miller and Richard violated his First Amendment rights by retaliating against him because of his speeches during the union meetings of February and August 2008. The district court granted summary judgment for the defendants, and Kidwell now appeals.

## II.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although we construe all facts and make all reasonable inferences in a light most favorable to the nonmoving party, *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004), we will affirm the district court's grant of summary judgment if the nonmoving party "is unable to 'establish the existence of an essential element to [that party's] case, and on which [that party] will bear the burden of proof at trial . . . .'" *Benuzzi v. Bd. of Educ.*, 647 F.3d 652, 662 (7th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). We review the district court's grant of summary judgment *de novo*. *Id.*

Kidwell claims that the defendants retaliated against him for engaging in speech protected under the First Amendment in violation of 42 U.S.C. § 1983. To succeed, Kidwell must make out a prima facie case of retaliation, demonstrating that: "(1) his speech was constitutionally protected; (2) he has suffered a deprivation likely to deter free speech; and (3) his speech was at least a motivating factor in the employer's actions."

*Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (citing *Spiegla*, 371 F.3d at 935, 940-41); *Redd v. Nolan*, 663 F.3d 287, 294-95 (7th Cir. 2011) (citing *Greene v. Doruff*, 660 F.3d 975, 977-78 (7th Cir. 2011)). In this case the defendants challenge only the third factor, so that is where we will focus our discussion. Accordingly, we express no opinion on whether Kidwell's speech was constitutionally protected or whether the department's actions constituted deprivations that were likely to deter free speech.

The district court issued its order granting summary judgment in favor of the defendants in April 2011. At that time, the third factor, which requires the plaintiff to demonstrate a causal link between his protected speech and the employer's actions, seemed to be in a state of transition in federal courts. For years, the Supreme Court had required that, to establish a prima facie case of retaliation, a plaintiff need only produce evidence sufficient to allow for an inference that his speech was a motivating factor in the employer's decision. *See Mt. Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Spiegla*, 371 F.3d at 941-43 (applying the test set forth in *Mt. Healthy*). Then along came the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 129 S. Ct. 2343 (2009), an Age Discrimination Employment Act case, which held that, "unless a statute provides otherwise, demonstrating but-for causation is a part of the plaintiff's burden in all suits under federal law." *Fairley v. Andrews*, 578 F.3d 518, 525-26 (7th Cir. 2009) (citing *Gross*, 129 S. Ct. at 2349). Notably, *Gross* did not overrule *Mt. Healthy*. This, in turn, created a tension in

our case law when several post-*Gross* decisions intimated that the motivating-factor standard had been replaced by the but-for standard. *Compare Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 500-01 (7th Cir. 2010), *Gunville v. Walker*, 583 F.3d 979, 984 n.1 (7th Cir. 2009), and *Fairley*, 578 F.3d at 525-26, *with Spiegla*, 371 F.3d at 941-43. Thus, on the issue of causation, district courts were understandably puzzled over whether to apply the still-surviving motivating-factor test articulated in *Mt. Healthy* and *Spiegla*, or whether to discard that test in favor of the but-for test set forth in *Gross* and *Fairley*. Many, like the district court in this case, disavowed the motivating-factor test and applied the but-for standard at the summary judgment stage. *See Greene v. Doruff*, 660 F.3d 975, 978 (7th Cir. 2011) (collecting cases).

This court's recent opinion in *Greene*, which was issued after the district court's summary judgment order in this case, shed some light on the "superficial" conflict between *Mt. Healthy/Spiegla* and *Gross/Fairley*, and set about reconciling their seemingly disparate holdings. *Id.* Here is the distinction: In the end, the plaintiff must demonstrate that, but for his protected speech, the employer would not have taken the adverse action. This explains the holdings of *Gross* and *Fairley*, which were cases that discussed the plaintiff's burden of proving causation at trial. *See Gross*, 129 S. Ct. at 2347, 2351; *Fairley*, 578 F.3d at 526. But preliminarily at summary judgment, the burden of proof is split between the parties. Initially, to establish a prima facie case of retaliation, the plaintiff must produce evidence that his speech was at least a motivating factor—or, in philosophi-

cal terms, a "sufficient condition"—of the employer's decision to take retaliatory action against him. *Greene*, 660 F.3d at 979-80. Then, the burden shifts to the employer to rebut the causal inference raised by the plaintiff's evidence. If the employer fails to counter the plaintiff's evidence, then the employer's retaliatory actions are considered a "necessary condition" of the plaintiff's harm, and the plaintiff has established the but-for causation needed to succeed on his claim.[1] *Id.* at 980.

So, to make out a prima facie case for retaliation at summary judgment, Kidwell must produce sufficient evidence to show that his purportedly protected speech was at least a motivating factor in the defendants' alleged retaliatory employment actions taken against him. Kidwell may do so by presenting either direct or circumstantial evidence. "'Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.'" *Rudin v. Lincoln Land Cmty. Coll.*, 420

---

[1] We recognize that the district court did not have the benefit of *Greene* when it rendered its opinion granting summary judgment to the defendants. It therefore did not properly allocate the burden of proof on the causation element between the parties, instead requiring Kidwell to satisfy the but-for standard on his own. No matter, because we may affirm on any basis that appears in the record. *Bivens v. Trent*, 591 F.3d 555, 559 (7th Cir. 2010) (citing *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008)). And so we will address each of Kidwell's arguments in support of his retaliation claim under the standard set forth in *Greene*.

F.3d 712, 720 (7th Cir. 2005) (quoting *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998)). Circumstantial evidence, however, is evidence from which a trier of fact may infer that retaliation occurred. *See id.* at 720-21. "Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other employees in the protected group." *Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 350, (7th Cir. 2009) (citation omitted). Importantly, regardless of which type of evidence is offered, "[t]o demonstrate the requisite causal connection in a retaliation claim, [a] plaintiff[] must show 'that the protected activity and the adverse action are not wholly unrelated.'" *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (quoting *Hunt-Golliday v. Met. Water Reclamation Dist.*, 104 F.3d 1004, 1014 (7th Cir. 1997)). Here, Kidwell relies solely on circumstantial evidence; specifically, he argues that the timing of the various alleged retaliatory employment actions taken against him was suspicious and that the defendants' departure from established procedures evinced a retaliatory motive.

## A. Suspicious Timing

Kidwell argues that the alleged retaliatory employment actions taken against him leading up to the decision to seek his termination amounted to "progressive discipline" and were close enough in time to his purportedly protected speech to allow a reasonable fact finder to infer that the actions were taken because of

that speech. That discipline, Kidwell contends, was composed of the following five incidents: the written reprimand on April 15, 2008; the restrictions on when and how he may meet with informants in late April 2008; the cancellation of his COPS Unit assignment in June 2008; the two-day suspension he received in September 2008; and the fact that the police department sought to terminate him following the car accident in September 2008.

At the outset, we note that suspicious timing will "'rarely be sufficient in and of itself to create a triable issue.'" *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). The reason is obvious: "[s]uspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) (citation omitted). Accordingly, for a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that "an adverse employment action follows close on the heels of protected expression, and the plaintiff [must] show that the person who decided to impose the adverse action knew of the protected conduct." *Lalvani v. Cook Cnty.*, 269 F.3d 785, 790 (7th Cir. 2001).

There can be no set legal rule for determining whether an adverse employment action falls "close on the heels" of protected activity because such a determination "depends on context." *Loudermilk*, 636 F.3d at 315. Of course, "[t]he closer two events are, the more likely

that the first caused the second." *Id.* But it is clear from our case law that the time period between the protected activity and the adverse action must be "very close." *Id.* (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). For an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action. *See, e.g., id.* at 314-15 (holding that a worker who handed his supervisor a note that complained of workplace discrimination and was immediately fired had established an inference of causation by way of suspicious timing); *Casna v. City of Loves Park*, 574 F.3d 420, 422-23, 427 (7th Cir. 2009) (holding that a one-day time period between the employee's complaint and her supervisor's recommendation to fire her was sufficient); *McClendon v. Ind. Sugars Inc.*, 108 F.3d 789, 796-97 (7th Cir. 1997) (holding that a two- to three-day time period between the employee's complaint and his discharge was sufficient). In this case, there was a significant time lapse between the two instances of purportedly protected speech and the several alleged retaliatory employment actions that Kidwell cites. Kidwell's first act of purportedly protected speech occurred on February 11, 2008. But the first alleged retaliatory action he cites, namely, the April 15, 2008 written reprimand for his "headhunting" comment, occurred more than two months later. Kidwell's second act of purportedly protected speech occurred on August 8, 2008, yet the next alleged retaliatory act taken against him after that union meeting occurred approximately five weeks later,

when he was suspended for two days for violating departmental policy when transporting an explosive device. The other alleged retaliatory actions cited by Kidwell were even more removed in time from his two acts of purportedly protected speech. Based on our case law, these extended time gaps alone militate against allowing an inference of causation based on suspicious timing.

But allowing such an inference would be even more inappropriate when we consider the context in which the various complained-of actions were taken. We have noted elsewhere that "an employee's complaint . . . does not immunize [him] from being subsequently disciplined or terminated for inappropriate workplace behavior." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002). Thus, where a "significant intervening event separat[es]" an employee's protected activity from the adverse employment action he receives, a suspicious-timing argument will not prevail. *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011). Here, as discussed below, the evidence shows that Kidwell's own aberrant actions or other intervening circumstances led to the negative responses that he incurred.

That the department took the first negative response, issuing Kidwell a written reprimand for his "headhunting" comment, cannot be surprising; not only was that comment insubordinate and a violation of departmental policy, but Kidwell himself acknowledged its impropriety, stating that "in hindsight . . . I wouldn't have said it if I had to go back and do it all over again . . . ."

Further, uncontroverted testimony by department officials shows that the second action taken in April 2008, which consisted of the department establishing a policy that prohibited officers from meeting with informants alone without telling someone in the department, was taken out of a concern for Kidwell's, as well as other officers', safety. Although Kidwell contends that he was not meeting informants without the department officials' knowledge, he does not dispute that the department officials received notice that Kidwell was meeting with informants outside of the officials' purview and that the officials had Kidwell's personal safety in mind when they instituted the policy. Moreover, Kidwell's contention that this policy was unique to him is unsupported by any evidence in the record.

The evidence shows that the third negative action that Kidwell faced—the cancellation of his COPS Unit assignment—had nothing to do with his purportedly protected speech. Indeed, Thomason began contemplating the merger of the COPS and POP Units in June 2007—well before the first instance of Kidwell's purportedly protected speech. He ultimately decided to merge the units in May 2008, alleviating the mounting strain on a department in the midst of economic challenges and manpower losses, and also freeing Kidwell to focus solely on his supervisory role in the patrol section. Kidwell questions the idea that a merger was contemplated from the inception of the POP Unit in June 2007 because the department issued a new COPS Unit policy in January 2008. But Thomason's

uncontroverted testimony shows that the manpower and economic issues that ultimately necessitated the merger did not surface until that same month. Further, intradepartmental resistance slowed the merger process for several months. Eventually, however, Thomason effected the merger, which had the ancillary effect of eliminating Kidwell's position. There is no evidence that this decision was based on Kidwell's purportedly protected speech; rather, the decision was based on wholly unrelated, intervening events.

The underlying facts of the fourth negative action, namely, Kidwell's two-day suspension in September 2008 as a result of his journey to Chicago with a civilian to pick up an explosive device, are likewise undisputed. Kidwell attempts to mitigate his role in this incident by claiming that the explosive device was merely a piece of firework, but he conveniently leaves out the fact that he did not know it was a firework until he arrived in Chicago. In fact, the informant who alerted Kidwell to the presence of this device initially described the device as a "grenade . . . that would have the potential of exploding." Therefore, this ill-advised journey—the facts of which are not in dispute—was unquestionably dangerous and, as noted by Thomason in his memorandum to Kidwell, was made in violation of departmental policy.

Finally, the fifth negative action, which consisted of the department's attempt to terminate Kidwell, was clearly the result of Kidwell's failure to pass a fitness-for-

duty evaluation.[2] Presumably as a source of vindication, Kidwell cites the arbitrator's finding that Kidwell should not be subject to any discipline for refusing to turn over Dr. Campion's fitness-for-duty report because the consent form was overly broad. But Kidwell has failed to show how that finding has any significance in this case. There is no evidence that the department's attempt to fire Kidwell for his insubordination in failing to turn over the fitness-for-duty report was a pretext for his having engaged in purportedly protected speech. If anything, the evidence demonstrates that if Kidwell had passed a fitness-for-duty evaluation at any point in time, he would have been allowed to return to work. Even the arbitrator noted that Kidwell's continued employment was based on his ability to pass a fitness-for-duty evaluation (albeit without having to sign a broad consent form). It was only after Kidwell

---

[2] The other two termination charges that the department filed against Kidwell included his trip to Burlington, Iowa, and his role in the accident during the high-speed chase. Notably, Kidwell was not punished for these incidents outside of the fact that they formed the basis for part of the department's termination case against him. We will address Kidwell's complaints about how the department handled the investigation into these incidents in the next section; however, we pause here to note that the arbitrator found that a seven-day suspension was warranted for Kidwell's role in these incidents. Such a punishment underscores the fact that Kidwell's own behavior—not his purportedly protected speech—served as a basis for the negative actions taken against him.

refused to cooperate with the department's efforts to have him declared fit for duty that Thomason took action (at Eisenhauer's direction). Regardless of whether Kidwell was within his rights to refuse to cooperate, nothing in the department's conduct indicates that the action it took was in response to Kidwell's purportedly protected speech.

In sum, none of the employment actions that Kidwell complains about followed close on the heels of his purportedly protected speech. Moreover, the context in which these actions were taken defies any argument that they were related to his speech. Rather, it is apparent that significant intervening events—not the least of which was Kidwell's own negative behavior—that occurred after Kidwell's acts of purportedly protected speech were the cause of the negative or disciplinary employment actions that he received. Therefore, the timing of events in this case does not give rise to an inference that Kidwell's speech was a motivating factor in any of the employment actions taken against him.

## B.  Failure to Follow Procedures

Kidwell also argues that the departments officials' failure to follow established procedures gives rise to an inference that his purportedly protected speech was a motivating factor in two of the termination charges filed against him. Specifically, Kidwell contends that the department officials did not follow the requirements of the Uniform Police Officers' Disciplinary Act ("UPODA"), 50 Ill. Comp. Stat. 725/1, *et seq.*, when it

questioned him after the Burlington, Iowa incident, and that the officials failed to follow the department's internal policies when investigating Kidwell's role in the accident during the high-speed chase.

In another context, we stated that an employer's "systematic abandonment of its hiring policies is circumstantial evidence" of a retaliatory motive. *Rudin*, 420 F.3d at 723; *see also Giacoletto v. Amex Zinc Co.*, 954 F.2d 424, 427 (7th Cir. 1992) (holding that the employer's deviation from its established procedure when terminating the plaintiff was circumstantial evidence of retaliation). Nevertheless, we do not require that an employer rigidly adhere to procedural guidelines in order to avoid an inference of retaliation. Instead, we look for pretext in the form of "a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). Moreover, when independent surrounding circumstances indicate that the employee's performance was seriously deficient and worthy of disciplinary action, a procedural abnormality will not suffice to establish a retaliatory motive. *See Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1114 (7th Cir. 1998).

UPODA provides certain procedural protections to police officers who are subject to discipline. 50 Ill. Comp. Stat. 725/1. Specifically, police officers who are interrogated after allegedly violating departmental policy must be given written notice of the nature of the investigation being conducted, the opportunity to have an attorney present, and reasonable opportunities for

rest. *See id.* 725/3.1-.11. UPODA defines an "interroga-tion" as "the questioning of an officer pursuant to the formal investigation procedures of the respective State agency or local governmental unit in connection with an alleged violation of such agency's or unit's rules which may be the basis for filing charges seeking his or her suspension, removal, or discharge." *Id.* 725/2(d). Impor-tantly, this definition "does not include questioning (1) as part of an informal inquiry or (2) relating to minor in-fractions of agency rules which may be noted on the officer's record but which may not in themselves result in removal, discharge or suspension in excess of 3 days." *Id.* A "formal investigation" is defined as "the process of investigation ordered by a commanding officer during which the questioning of an officer is intended to gather evidence of misconduct which may be the basis for filing charges seeking his or her removal, discharge or suspension in excess of 3 days." *Id.* 725/2(c). In contrast, an "informal inquiry" is defined as a meeting between supervisory personnel and an officer "upon whom an allegation of misconduct has come . . . , the purpose of which meeting is to mediate a citizen complaint or discuss the facts to determine whether a formal investigation should be commenced." *Id.* 725/2(b).

Here, Kidwell only vaguely argues that he was not given the protections guaranteed by UPODA during the investigation into his actions during the Burlington incident. The only specific alleged violation of UPODA to which Kidwell points is an informal conversation he had with Thomason after the incident had occurred. Kidwell contends that Thomason relied on that conversa-

tion when filing one of the termination charges against him a year later. Kidwell argues that this was improper because Kidwell never received UPODA procedural protections. But Kidwell makes no effort to establish which protections were violated or how any such violations were a pretext for a retaliatory motive instead of simply errors. Without more, Kidwell's conclusory argument fails.

Moreover, Kidwell cannot establish that his questioning was part of a "formal investigation" (as defined under UPODA), and thus that UPODA protections even apply. Indeed, other than Thomason's conversation with Kidwell after Kidwell's return from Burlington, there is no evidence that Thomason ordered an investigation pursuant to departmental policy. And to the extent that Kidwell argues that his conversation with Thomason could itself be construed as a "formal investigation," that argument fails. As noted above, a formal investigation requires that the intent of supervisory personnel in questioning a police officer be to gather evidence that forms the basis of the charges "seeking [the officer's] removal, discharge or suspension in excess of 3 days." *Id.* 725/2(c). There is no evidence in the record to support the conclusion that Thomason's conversation with Kidwell was intended to gather evidence to seek Kidwell's removal, discharge, or suspension. True, the Burlington, Iowa incident formed the basis for one of the charges against Kidwell when the department sought his termination a year later, but the evidence shows that between the time of Thomason's conversation with Kidwell about the

Burlington incident and the time the charges were filed, Thomason was open to Kidwell returning to work if he could pass a fit-for-duty evaluation. Therefore, there is no evidence from which a reasonable factfinder could infer that Thomason's conversation with Kidwell was an attempt to glean evidence from which Kidwell could be terminated. Instead, that conversation was at best an "informal inquiry," and therefore Kidwell was never "interrogated" as defined by UPODA. *See id.* 725/2(d). The procedural protections therein simply do not apply in this case, and Kidwell's argument fails.

Kidwell also contends that the police department officials failed to follow departmental policy when investigating his role in the accident that occurred during the high-speed car chase. The Danville Police Department Policy Manual states that, "[w]henever a police vehicle is involved in a vehicle accident which involves death, serious injury, or major property damage, the on duty supervisor will request the accident to be investigated by either the Vermilion County Sheriff's Department or the Illinois State Police." Although the accident certainly resulted in serious injury and major property damage, Kidwell argues that Thomason's appointment of Detective Stark—a Danville police officer—to head the ensuing investigation violated departmental policy and therefore is evidence of a retaliatory motive.

Detective Stark's appointment was undoubtedly a technical violation of the written policy terms. But

uncontroverted testimony from Thomason shows that this policy was construed to mean that an independent law enforcement agency would be appointed to head an investigation only if a death occurred in an accident involving a police and a civilian vehicle. Because there were no deaths that resulted from the accident, Thomason saw no need to appoint an outside agency. As another circuit has stated, "[i]t is generally for an employer to interpret its own policies." *Richey v. City of Independence*, 540 F.3d 779, 786 (8th Cir. 2008). Kidwell does not argue that this construction of the policy was disparately applied or that it was done for a retaliatory purpose. What is more, simply showing a violation of policy is not enough. Kidwell must point to "a dishonest explanation [for deviating from policy], a lie rather than an oddity or an error." *Kulumani*, 224 F.3d at 685. He does not do so.

Additionally, Kidwell cannot demonstrate a retaliatory motive based on a technical violation of policy when the circumstances reveal a pattern of deficient actions on his part. For example, in *Fortier* we acknowledged that "an employer's failure to follow policies . . . may show . . . that the employer's asserted reason for termination (deficient performance) might be pretextual." *Fortier*, 161 F.3d at 1114. In that case, however, we found that even if the employer had failed to follow its established policies when terminating the plaintiff, because other evidence showed that the employer believed that the plaintiff's performance was "seriously deficient," as indicated by previous warnings and counseling sessions given to the plaintiff, a technical

violation of policy was insufficient to give rise to an inference of a retaliatory motive. *Id.* This case is similar; by the time the high-speed chase accident occurred, Kidwell had been issued a written reprimand, admonished verbally, and suspended for two days. Like the employer in *Fortier*, here the police department officials had determined—independently of the high-speed chase accident investigation—that Kidwell's performance was seriously deficient. Under such circumstances, Thomason's failure to appoint an outside agency to head the accident investigation is not sufficient to raise an inference of a retaliatory motive.

**III.**

Kidwell has failed to demonstrate that his purportedly protected speech was at least a motivating factor in the defendants' negative employment actions taken against him. Specifically, Kidwell's suspicious-timing argument fails because his complained-of employment actions did not follow closely on the heels of his purportedly protected speech, and because significant intervening events—especially Kidwell's own deficient performance—separated Kidwell's speech from the negative employment actions. Additionally, Kidwell has failed to demonstrate that any deviations from policy—if they occurred at all—were dishonest and pretextual. Moreover, because independent surrounding circumstances demonstrate that his performance was seriously deficient and worthy of disciplinary action, Kidwell cannot point to technical deviations from pro-

cedure to raise an inference of retaliation. For these reasons, we AFFIRM.