In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 20-2061

BETH A. SWEET,

*Plaintiff-Appellant,*

*v.*

TOWN OF BARGERSVILLE and
STEVE LONGSTREET,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:18-cv-01950-TWP-MJD — **Tanya Walton Pratt**, *Chief Judge.*

_____

ARGUED DECEMBER 7, 2020 — DECIDED NOVEMBER 17, 2021

_____

Before SYKES, *Chief Judge*, and BRENNAN and ST. EVE, *Circuit Judges*.

SYKES, *Chief Judge*. After a steady buildup of performance problems, Beth Sweet lost her job as a customer-service representative in the clerk-treasurer's office in the Town of Bargersville, Indiana. Several months before she was fired, Sweet criticized Steve Longstreet, the elected clerk-treasurer, for reconnecting the utility service of a delinquent customer

who happened to be Longstreet's wealthy business partner.
Sweet contends that she was fired for vocalizing her opposi-
tion to the reconnection, so she sued Longstreet and the
Town alleging a claim of retaliation in violation of her First
Amendment right to freedom of speech. Her evidence in
support of retaliatory motive is paltry—"suspicious timing"
in the form of a five-month gap between her criticism and
the termination of her employment; an ambiguous affidavit
from a fellow employee; and the fact that her former em-
ployer offered several reasons for her termination rather
than a single, consistent explanation. The district court held
that Sweet failed to establish a prima facie case of retaliation
and entered summary judgment for the defendants. We
affirm.

## I. Background

Beth Sweet worked as a customer-service representative
in the Bargersville clerk-treasurer's office for almost
20 years. Throughout most of her employment, Sweet was
responsible for collecting utility bills and setting up payment
plans for customers. In 2012 Steve Longstreet was elected to
the clerk-treasurer position. Three years later, the office
outsourced collections to a private firm to cut costs, so Sweet
shifted to a more general customer-service role in which she
communicated with customers and managed disconnections
on overdue utility accounts.

Sweet had generally received positive performance
reviews until her transition away from collections in 2015.
After that point, her annual reviews showed a decline in her
performance. Her 2015 and 2016 reviews, which rated her
overall performance at 2.6/5.0 and 2.0/5.0 respectively, noted
that she was argumentative, resistant to change, and disor-

ganized. Those reviews—along with Sweet's numerous write-ups and a journal kept by her supervisor Melissa Fraser—documented many specific and recurring problems. She failed to learn the new billing system, which her supervisors chalked up to her lack of initiative and anger at office leadership for outsourcing collections. She refused to cross-train fellow employees on processes in which she had expertise. She regularly clocked in 10–20 minutes before beginning work, casually passing the time in the breakroom or restroom before finally reporting to her desk. Clocking in early but not starting her duties meant that she received overtime pay for time she didn't work. And Sweet habitually used her work computer and cell phone for personal matters during work hours. To top it all off, she bullied a fellow employee by accusing her of receiving her job as a favor from a Town council member.

In August 2017 Sweet noticed that Jim Parsetich, a wealthy Bargersville resident, had fallen behind on his utility payments, so she disconnected his service. Longstreet countermanded her decision and reconnected Parsetich's utilities after business hours. Sweet believed that Longstreet's action was influenced by Parsetich's prominence in Bargersville and by the fact that the two were business partners in a land-development project.

Sweet vocalized her opposition to Longstreet's action to others in the office. She also confronted him about the reconnection and expressed her view that customers should be treated uniformly, regardless of their wealth or the extent of their property ownership. She testified in deposition that Longstreet told her that she could not treat multimillionaires the same way as a poor person. Longstreet testified that he

has no recollection of discussing the matter with Sweet and that reconnecting Parsetich's utilities was consistent with his general policy of reducing the number of disconnections in Bargersville, which he viewed as an unnecessary waste of resources.

Shortly after this incident, Sweet was removed from handling disconnections. Later that year, she made a costly fee-collection error. She incorrectly informed Jessen Funeral Home that it was not required to pay an engineering fee for work performed on its property. Her mistake cost the Town about $1,000.

Longstreet fired Sweet in January 2018. She claims that he told her the decision to let her go was related to the office's transition to greater use of automation, for which her skills were a poor fit. She also contends that Nancy Kehl, the deputy clerk-treasurer, later gave her a different explanation, telling her that the leadership team had decided in late November or early December 2017 to fire her because of the fee-collection error involving the funeral home.

Six months after she was fired, Sweet sued Longstreet and the Town under 42 U.S.C. § 1983 alleging a violation of her First Amendment right to free speech.[1] The claim rests on a retaliation theory: Sweet alleges that she was fired for objecting to Longstreet's decision to reconnect Parsetich's utilities.

---

[1] Sweet also raised an age-discrimination claim but has abandoned it on appeal.

After lengthy discovery, the district judge entered summary judgment for the defendants.[2] She assumed without deciding that Sweet's criticism of Longstreet was constitutionally protected speech and instead rested her decision on the causation element of the claim, ruling that Sweet's evidence of retaliatory motive was insufficient to establish a prima facie case. Sweet unsuccessfully sought reconsideration, and this appeal followed.

## II. Discussion

To establish a prima facie case of First Amendment retaliation, a public employee must show that: "(1) she engaged in constitutionally protected speech; (2) she suffered a deprivation likely to deter her from exercising her First Amendment rights; and (3) her speech was a motivating factor in her employer's adverse action" against her. *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 670 (7th Cir. 2009). If the plaintiff produces enough evidence to establish each of these elements, the burden shifts to the public employer to demonstrate that it would have taken the same action regardless of the protected speech. *Id.* Even then, the plaintiff can still survive summary judgment by

---

[2] Neither party mentions the special requirements for holding a municipality liable under § 1983, which is permissible only when a constitutional violation occurs as a result of a municipal custom or policy or when the violation is committed by an individual with final policymaking authority. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009) (applying *Monell* to a First Amendment retaliation claim against a municipality). We assume without deciding that Longstreet had final policymaking authority, thereby making the Town liable for his constitutional violations. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

producing evidence showing that the employer's proffered reason for the action was merely pretextual. *Id.*

The district judge held that Sweet failed to carry her burden on the elements of her prima facie case. We review the judge's order de novo. *Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.*, 955 F.3d 632, 643 (7th Cir. 2020).

## A. Protected Speech

As we've noted, the judge assumed that Sweet's criticism of Longstreet was constitutionally protected speech and moved directly to the element of causation. We could take the same shortcut; as we will explain, the evidence is insufficient to establish retaliatory motive. But we're skeptical that Sweet's speech was constitutionally protected in the first place. For completeness, we turn briefly to the first element of the claim.

"[P]ublic employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). The Amendment protects "a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* But it "does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." *Id.* at 424. "[S]peech that owes its existence to a public employee's professional responsibilities" does not implicate the employee's rights under the First Amendment. *Id.* at 421. "[A]n employee's speech about misconduct affecting an area within her responsibility is considered pursuant to her employment even when she is not strictly required to make it." *Hatcher v. Bd. of Trs. of S. Ill. Univ.*, 829 F.3d 531, 539

(7th Cir. 2016), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).

Sweet's job duties during the relevant time period included handling utility disconnections. Her criticism of Longstreet for reconnecting a delinquent citizen amounted to a complaint about possible misconduct in her official area of responsibility. Under a straightforward application of *Garcetti*, her criticism of Longstreet was not constitutionally protected. *Accord Renken v. Gregory*, 541 F.3d 769, 774 (7th Cir. 2008) (holding that the speech of a professor who spoke out against the funding decisions of a supervisor was made pursuant to official duties).

Sweet deploys a familiar tactic to get around *Garcetti*: she minimizes the scope of her job duties as a customer-service representative. Specifically, she claims that it was not her job as a low-level employee to confront a high-ranking elected official about questions of policy.

But *Garcetti* and our precedents do not define job duties so narrowly. *Spiegla v. Hull*, 481 F.3d 961, 966 (7th Cir. 2007) ("focus[ing] on 'core' job functions is too narrow after *Garcetti*"). The inquiry is a practical one that goes beyond an employee's formal job description. *Garcetti*, 547 U.S. at 424–25. Simply put, Sweet was responsible for utility disconnections, and she criticized her boss over his decision to reconnect a wealthy delinquent customer. Sweet's speech thus "owe[d] its existence to [her] professional responsibilities," *id.* at 421, even though she was "not strictly required to make it," *Hatcher*, 829 F.3d at 539. Because her complaint about Longstreet fell within the scope of her official duties, her case fails at the first step in the analysis.

### B. Causation

Even if Sweet's criticism of Longstreet was constitutionally protected, she lacks sufficient evidence to support an inference that it was a motivating factor in the termination of her employment. As is often the case, Sweet's evidence of retaliatory motive is circumstantial. "Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other employees in the protected group." *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009).

Sweet argues that the timing of Longstreet's decision to fire her is suspicious. Although "suspicious timing will rarely be sufficient in and of itself to create a triable issue," if the employee's speech and the adverse employment action are very close in time, it may be probative of a causal link between the two events. *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (quotation marks omitted).

Sweet complained about Longstreet's decision to reconnect Parsetich's utilities in August 2017, and she was fired five months later, in January 2018. That time lapse is simply too great to support an inference of retaliatory motive. Though there is "no set legal rule[,] … we typically allow no more than a few days to elapse between the protected activity and the adverse action." *Id.* In *Kidwell* we held that a two-month gap and a five-week gap were not close enough to establish probative suspicious timing. *Id.* at 967. We have rejected similar timelines in numerous other cases.[3] *See, e.g.,*

---

[3] Sweet contends that the district judge relied on a case that was subsequently overruled in holding that her speech and firing were too far apart to establish suspicious timing. *See Galdikas v. Fagan*, 342 F.3d 684

*Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000) (three-month gap); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (five-month gap). Sweet's criticism of Longstreet was far too distant from the termination of her employment to support a causal link between the two. A gap of five months is much longer than anything we have accepted as evidence of retaliatory motive.

To salvage this argument, Sweet recasts the timing calculation. The relevant timeframe, she contends, is measured from the time of her criticism of Longstreet to the time that he *decided* to fire her. This argument relies on Kehl's statement that the leadership team decided to fire Sweet as early as late November. That would reduce the timing gap to three months.

As reframed, Sweet's argument has two shortcomings. First, even if November rather than January is the relevant point in time, we're left with a three-month gap—still too long to support an inference of retaliatory motive. Second, to assess whether the employer's timing is suspicious enough to be probative of retaliation, we look to the duration of time between the protected speech and the adverse employment action itself, not the steps in the decision process that preceded it. *Kidwell*, 679 F.3d at 966–67.

Sweet argues in the alternative that she suffered an adverse employment action when she was removed from

(7th Cir. 2003), *overruled in part by Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004). We need not address the extent to which *Galdikas* remains good law because other precedent makes clear that the five-month gap between Sweet's speech and termination is too long to infer suspicious timing.

performing utility disconnections, which occurred shortly after her criticism of Longstreet. But a reassignment of job responsibilities "is not materially adverse unless it represents a *significant* alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects." *Koty v. DuPage County*, 900 F.3d 515, 520 (7th Cir. 2018) (quotation marks omitted). No evidence suggests that the reassignment from performing disconnections was materially adverse.

Sweet also relies on an affidavit from Jennifer Ashbaugh-Ernest, a fellow employee who was also supervised by Fraser. *See Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013). In her sworn statement, Ashbaugh-Ernest attested that in August 2017 she billed a developer for utility fees incurred before the property owner took possession of the property, but Fraser told her that she needed to bill the property owner instead. Ashbaugh-Ernest complained to Kehl about Fraser's admonition and was fired at the end of the month.

Ashbaugh-Ernest's affidavit does not add anything to Sweet's case. For starters, we do not know if she actually thinks her criticism of Fraser led to the termination of her employment; her affidavit is silent on this point. And she says nothing at all about Longstreet or his involvement in the decision to fire Sweet. Even if we assume for the sake of argument that Kehl and Fraser acted with retaliatory motive in firing Ashbaugh-Ernest, their actions shed no light on whether Longstreet was motivated by a desire to retaliate against Sweet—or any other subordinate in the office who may have criticized him. *Willis v. Marion Cnty. Auditor's Off.*, 118 F.3d 542, 546 (7th Cir. 1997) ("Statements by subordi-

nates normally are not probative of an intent to retaliate by the decisionmaker.").

Finally, Sweet relies on what she says are the "shifting" explanations for why she was fired. She claims that Longstreet told her she lost her job to automation but Kehl later gave her a different explanation, saying she was fired because of the billing mistake involving the funeral home. Sweet also points to a statement in Longstreet's affidavit in which he refers to her bullying as a factor in the decision to terminate her employment.

Whatever else might be said about this evidence, it's not enough to establish retaliatory motive. An employer's shifting explanations for taking an adverse employment action may be evidence that its proffered reason is pretextual. *See, e.g.*, *Reid v. Neighborhood Assistance Corp. of Am.*, 749 F.3d 581, 589 (7th Cir. 2014); *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013). But Sweet's evidence, when read in context, does not suggest pretext. Rather, the evidence as a whole points in the same direction: Sweet was fired for *multiple* reasons, as summarized in Longstreet's affidavit, which is not nearly as limited as Sweet implies. He attested that Sweet was fired because of "her long documented history of deficient performance, failure to improve on requested areas, incidences of bullying and repeated mistakes."

In short, Sweet has not produced sufficient evidence from which a reasonable jury could infer retaliatory motive. Because her criticism of Longstreet was not constitutionally protected and the record does not suggest that her speech was a motivating factor in the termination of her employ-

ment, the judge appropriately entered summary judgment for the defendants.

AFFIRMED