In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 18-3102

PETER DAZA,

*Plaintiff-Appellant,*

*v.*

STATE OF INDIANA, *et al.*,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 17-cv-0316 — **Jane Magnus-Stinson**, *Chief Judge.*

———————————

ARGUED SEPTEMBER 10, 2019 — DECIDED OCTOBER 24, 2019

———————————

Before WOOD, *Chief Judge*, and KANNE and BRENNAN, *Circuit Judges.*

KANNE, *Circuit Judge.* After the Indiana Department of Transportation ("INDOT") fired Peter Daza from his position as a geologist, Daza filed various claims against the State of Indiana and INDOT employees, alleging that his firing was unlawful. The district court granted summary judgment to the defendants on all Daza's claims. Daza appeals only the grant of summary judgment on his claims under 42

U.S.C. § 1983. Those claims alleged that the defendants violated his First Amendment rights by discriminating and retaliating against him for his political activities and affiliation. Because Daza has failed to show that any of his alleged protected activities or political affiliation motivated his firing, we affirm.

## I. BACKGROUND

Peter Daza began working for INDOT in 1993. During his twenty-two-year tenure, he worked in INDOT's Vincennes District both as a geologist and as a supervisor. As a geologist, Daza tested construction materials to ensure they complied with INDOT standards. As a supervisor, Daza oversaw the work of other INDOT employees.

Daza had not received any formal discipline until after a change in leadership that occurred in September 2009. At that time, a former Republican Indiana State Representative, Troy Woodruff, was appointed District Deputy Commissioner of INDOT's Vincennes District. Almost a year later, Woodruff was promoted to Chief of Operations, and Woodruff's friend, Russell Fowler, replaced Woodruff as Vincennes's Deputy Commissioner.

Daza alleges the political discrimination began two years later, in 2011. INDOT employees learned that one of Daza's supervisees, Terry Goff, had posted political statements on his private Facebook page. One employee asked Daza to speak with Goff about the posts, expressing concern that the posts might inhibit Goff's ability to obtain a promotion.

Later that year, in August 2011, Goff interviewed for and was denied a promotion. Upset with this decision, Goff told the Director of Technical Services, Valerie Cockrum, that he

felt disrespected by an interviewer who had texted during the interview. But Daza had his own theory about why Goff did not receive the promotion: politics. Daza voiced this concern to Cockrum five days after Goff's complaint, claiming that Goff was consistently passed over for promotions because of his connections to the Democratic party. Cockrum responded that she would keep Daza's complaint to herself, and she commended Daza for his honesty and loyalty.

Goff's troubles continued throughout 2011. Daza, who completed a performance appraisal of Goff every year, gave Goff an initial overall rating of "outstanding." But because Woodruff and Fowler disagreed with this assessment, Goff's final 2011 appraisal reflected an overall performance rating of "exceeds expectations," one level below his original "outstanding" rating.

The next year and a half passed without incident. Around February 2013, Chief of Operations Woodruff was involved in a public scandal.  It was discovered that he had previously failed to disclose his financial interest in land purchased by INDOT. This scandal received public attention and was discussed by employees at INDOT's Vincennes District. Daza complained to Cockrum about Woodruff's misuse of political office.

One month after his complaint, Daza received his first written reprimand. The Vincennes District had been unusually busy due to construction on I-69, so Fowler required employees with an INDOT-issued cell phone to be available for calls after business hours. Daza did not take kindly to this requirement. He complained and told other employees that it was not a part of his job to work overtime. Daza's supervisor, Brent Schmitt, heard about these complaints and approached

Daza directly to ask him to answer calls after hours. Daza repeatedly told Schmitt he would not answer these calls, but ultimately agreed to comply with this request. Schmitt issued Daza a written reprimand for his insubordinate and defiant behavior.

Still, 2013 was not all bad for Daza. Even with the written reprimand, Daza received praise in his annual performance appraisal. The report complimented Daza's willingness to help others and his ability to arrive at data-based solutions. But it also reflected Daza's struggles to remain professional with his colleagues. Daza received an overall performance rating of "meets expectations" in 2013.

The following year, Daza again defended Goff from alleged political discrimination. In March 2014, Goff declined to help snow plow because of a shingles flare up. Schmitt alerted Daza to this situation, noting that INDOT would both request a doctor's note and issue Goff a formal warning that could lead to disciplinary action. Daza took issue with this treatment of Goff, and he complained to Cockrum that Goff is "obviously a target and they are trying to come at him with a take-no-prisoners attitude."

The same day Daza made this complaint, Nina Daniel, a Human Resources Manager, emailed another employee about Daza. In that email, Daniel mentioned that Daza's supervisor, Schmitt, had discussed Daza's behavior with her: Schmitt told Daniel that Daza's job knowledge is "one of the best in the state" but that Daza's professionalism had been described as a "cancer on the department." Daniel's email also pointed out that there was "little on [Daza's] file discipline wise," but there was evidence of a pattern of behavior.

Tensions between Daza and Schmitt continued to run high. Later that month, in March 2014, Daza emailed Cockrum expressing discontent with Schmitt. Daza implied that Schmitt never comes to work and even suggested that Schmitt should quit. Then Daza took issue directly with Cockrum, who had recently asked Daza to mentor another INDOT geologist in a different district. Daza alleged that Cockrum gave him this task to set him up for future bad evaluations. Daza expected that his days with INDOT were numbered.

The following month, INDOT hired T.J. Brink, a Republican City Council member, as Vincennes's Safety Director. This hiring, Daza argues, stands in stark contrast to how INDOT treated Daza. Brink had no experience in safety, and his only professional experience was as a Director of Business Development. Yet, Fowler was "anxious" to offer Brink the position. (Appellant's Br. at 9.) Fowler just needed to determine if there was an ethical problem with hiring a current City Council member. There was not, and Brink was hired.

Over a year later, management again took issue with Daza's behavior. On November 22, 2015, Daza's mother published a letter to the editor with a regional newspaper, criticizing then-Indiana Governor Pence's position on immigration. Daza discussed this letter with Cockrum and other INDOT employees. A few days later, Brink went to Cockrum with concerns about Daza's behavior. Brink complained that Daza checked out a respirator after being told during training not to use it. Cockrum pointed out the respirator was checked out before Daza was given this instruction. Still, Brink complained about Daza's responses to questions during the

training. Cockrum met with Daza and warned him not to further antagonize Brink.

About a week later, on December 1, 2015, Daza attended the first day of a training class scheduled for multiple days that month. Daza alleges the trainer did not like him. The trainer did take issue with Daza's behavior during the session. In her notes, the trainer stated that Daza refused to pay attention and closed his eyes several times, that he refused to participate in training activities, and that she heard Daza refer to part of the training as "f_ _ _ _ ing gay." The trainer's supervisor emailed these notes to Human Resources and stated that she had concerns about Daza attending the second training class scheduled for December 9.

After receiving this information, Human Resources employees discussed with Fowler how to move forward with Daza. Human Resources Manager Daniel noted that Daza's past behavior could be considered arrogant and insubordinate. She said that INDOT had previously terminated a different employee for a continued pattern of negative behavior. However, due to a lack of progressive discipline in Daza's past, another employee recommended only a three-to-five-day suspension. In the same discussion, Fowler—who was the ultimate authority on employment decisions—indicated that he was ready to proceed with termination.

On December 7, 2015, Daza emailed employees he supervised, telling them they had been nominated for a bonus based on their recent work performance. Daza understood that these bonuses are meant to surprise employees and that the bonuses could still be denied. But Daza had sent these emails for years, and Human Resources never took issue with the practice. This time, Daniel expressed to another employee

concerns about Daza's December 7 emails. She questioned how it would make management look if the bonus was later denied.

The next day, December 8, 2015, Cockrum notified Daza that he should not attend the second day of training on December 9. Daza asked for more information but was told to wait until a December 10 meeting with Fowler.

At the December 10 meeting, Fowler informed Daza his employment was being terminated. Fowler made this decision without input from Daza's supervisor and without allowing Daza to respond to the allegations against him. Daza received a memo explaining that he was fired because his behavior consistently defied INDOT culture and expectations. The memo recalled his 2013 written reprimand, 2013 performance appraisal, and behavior during the December 1, 2015 training session.

Daza filed a Charge of Discrimination with the Indiana Civil Rights Commission. He claimed INDOT discriminated against him due to his race, color, age, and disability. One day later, he filed a similar Civil Service Employee Complaint with the Indiana State Personnel Department.

Daza then initiated this lawsuit in the Southern District of Indiana, bringing various claims against the State of Indiana, Fowler, Daniel, and Cockrum. He alleged that he was discriminated and retaliated against based on his race, color, age, political speech, and political affiliation. Specifically, Daza brought claims under 42 U.S.C. §§ 1981, 1983; the First and Fourteenth Amendments; the Age Discrimination and Employment Act, 29 U.S.C. § 621 *et seq.*; and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. The defendants

moved for, and the court granted, summary judgment on all counts.

Daza appealed the district court's grant of summary judgment to the defendants on his § 1983 political-discrimination and political-retaliation claims.

## II. ANALYSIS

Summary judgment is appropriate when there is no dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We review grants of summary judgment *de novo* and construe all facts and reasonable inferences in a light most favorable to the nonmoving party. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017). But this "favor toward the nonmoving party does not extend to drawing 'inferences that are supported by only speculation or conjecture.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008)).

Daza argues that INDOT's series of acts, culminating in his firing, amounts to a violation of his First Amendment rights. The First Amendment prohibits public employers from firing an employee based on that employee's constitutionally protected political conduct. *See Elrod v. Burns*, 427 U.S. 347, 357 (1976). Daza argues that his employer's conduct amounts to both political discrimination and retaliation under the First Amendment. To establish a *prima facie* claim of First Amendment political *discrimination*, a plaintiff must show: (1) that the plaintiff's conduct is constitutionally protected; and (2) that the protected conduct was a motivating factor in the employer's actions. *Bisluk v. Hamer*, 800 F.3d 928, 933 (7th Cir. 2015). To state a *prima facie* claim of First Amendment political

*retaliation*, the plaintiff must additionally show a deprivation likely to deter free speech. *Yahnke v. Kane Cty.*, 823 F.3d 1066, 1070 (7th Cir. 2016).

Here, Daza's discrimination and retaliation claims each fail because he has not shown that his alleged protected conduct motivated his firing. We therefore need not decide whether his defenses of Goff and discussions about his mother's letter to the editor are constitutionally protected and—for his retaliation claim—whether he suffered a deprivation likely to deter free speech.

To show that protected conduct was a motivating factor in the employer's action, a plaintiff must demonstrate a causal connection between the conduct and the employer's action. *Graber v. Clarke*, 763 F.3d 888, 899 (7th Cir. 2014). As a threshold matter, the plaintiff must show that the defendant was aware of the protected conduct. *See Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004). If the defendant was aware of the conduct, a causal connection can then be demonstrated by suspicious timing alone only when the employer's action follows on the close heels of protected expression. *Lalvani v. Cook Cty.*, 269 F.3d 785, 790 (7th Cir. 2001) ("As the time separating the protected conduct and the adverse employment action grows, the causal inference weakens and eventually time becomes the plaintiff's enemy."). For an employer's actions to be on the close heels of an employee's conduct, thus allowing an inference of causation based on timing alone, we "typically allow no more than a few days to elapse." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). But this is a context-specific analysis with no formal legal rule. *Id.*

When suspicious timing alone is insufficient to carry the plaintiff's burden, a plaintiff may "survive summary

judgment if there is other evidence that supports the inference of a causal link." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005).

In an attempt to satisfy this burden, Daza alleges political discrimination and retaliation spanning four years. Daza claims that his mistreatment began two years after Republicans Woodruff and Fowler became leaders in the Vincennes District. After years without any incidents, Daza believes three protected political acts motivated his firing: (1) his defenses of Goff, a Democrat he supervised, (2) his mother's letter to the editor criticizing a Republican Governor, and (3) his status as a Democrat. Daza claims that complaints about his behavior occurred after, and because of, his alleged political activities during this time. But for the reasons discussed below, the evidence does not demonstrate that Daza's alleged protected political activities were a motivating factor in his firing. Consequently, Daza has failed to satisfy his burden on an element of his claims.

*A. Defenses of Goff*

First, Daza has failed to connect his defenses of Goff to his firing. He argues that his two separate defenses of Goff were a motivating factor in Fowler's decision to terminate his employment.

Daza defended Goff from perceived political discrimination in August 2011 and again in March 2014 when Goff refused to snow plow because of shingles. Daza was fired December 10, 2015, more than a year after his most recent defense of Goff, and four years after his first defense of Goff. Daza's firing occurred well after both events, not on the close heels of them. *Lalvani*, 269 F.3d at 790. And Daza offers no

additional evidence showing these acts motivated his firing. The memo explaining Daza's firing, as well as internal communications, did not mention these occurrences. In fact, his defenses of Goff never led to disciplinary action. Time is Daza's enemy here, and he cannot show that defending Goff motivated his firing.

### B. Letter to the Editor

Daza also has not established that his mother's letter to the editor contributed to his firing. Daza alleges that being fired weeks after discussing his mother's letter to the editor with INDOT employees is evidence of a causal connection. He additionally points out that Cockrum and Fowler did not respond negatively to Daza's practice of emailing bonus nominees until after his mother's letter to the editor.

But for this theory to have legs, Fowler would need to be aware of the letter and Daza's connection to it. *See Hall*, 389 F.3d at 762. Fowler's signed declaration states that he did not learn about Daza's mother's letter until after he fired Daza, and Daza fails to present any contrary evidence. So, as a threshold matter, Daza fails to show Fowler was aware of this alleged protected activity. Daza's mother's letter to the editor, and Daza's discussion of the letter with INDOT employees, were therefore not a motivating factor in his firing.

### C. Political Affiliation

Finally, Daza cannot show his status as a Democrat motivated his firing. Political affiliation is protected by the First Amendment. *Hagan v. Quinn*, 867 F.3d 816, 824 (7th Cir. 2017). But to prove discrimination based on political affiliation, a plaintiff must present evidence relevant to the question of whether the plaintiff's political affiliation was a motivating

factor in their employer's action. *See Brown v. Cty. of Cook*, 661 F.3d 333, 336 (7th Cir. 2011).

In *Brown*, we held that a sergeant in a sheriff's office failed to show his political affiliation was a motivating factor in the sheriff's decision to not promote him. *Id.* at 338. We specifically noted that most of the evidence Brown tendered was irrelevant to whether the sheriff considered political affiliation in the decision to not promote Brown. *Id.* at 336. For example, Brown presented as evidence of discrimination his ability to accurately predict upcoming promotions before they were announced. *Id.* at 338. But this evidence had nothing to do with political affiliation, and even suggested that the promotions were based on objective criteria rather than political party. *Id.*

Here, Daza claims to have a significant amount of evidence showing his status as a Democrat motivated his firing. He argues that his defenses of Goff and his mother's letter to the editor, in addition to a long list of other workplace occurrences, are all evidence that he was fired because of his political affiliation. The evidence Daza provides in support of this claim includes: Daza's various written and verbal complaints to Cockrum; Fowler's treatment of Daza compared to the hiring of Brink; INDOT's failure to progressively discipline Daza; Brink's and Fowler's complaints about Daza's behavior following his mother's letter to the editor; the trainer's comments on Daza's behavior shortly after his mother's letter to the editor; Daniel's complaint about Daza's emails, sent on December 7, 2015, to potential bonus recipients; and Fowler's refusal to allow Daza to respond to the allegations against him before terminating his employment.

But Daza fails to show how any of this evidence relates to his political affiliation. For example, Daza believes that his

various complaints to Cockrum, and her response thanking him for his honesty, are evidence that he was fired because of his political affiliation. But Cockrum's compliment did not reference Daza's political affiliation. In fact, none of her communications with Daza or Fowler ever referenced Daza's political affiliation.

Daza also alleges the trainer's comments on his behavior at the December 1, 2015 training somehow show that Fowler terminated him based on his political affiliation. But the trainer's notes about Daza refer to specific instances from the training and do not mention his political party. Nor does the record show that the trainer was aware of Daza's political affiliation. So, it does not follow that the trainer's notes about Daza's behavioral issues caused Fowler to fire Daza for his political affiliation. The trainer's notes instead suggest that Fowler's decision to fire Daza was based on a series of inappropriate behavior that culminated in Daza's offensive comments at the December 1 training.

Daza similarly believes that Fowler's refusal to allow Daza to respond to negative allegations, while affording this opportunity to other INDOT employees, is evidence of political discrimination. But Daza does not produce the names of any specific employees who were given an opportunity to respond to allegations before they were fired. And Daza provides no evidence that Fowler decided who can and cannot respond to allegations based on their political affiliation. Instead, the record shows Fowler made the decision to proceed with termination based on his frustrations with how Daza, a supervisor, consistently failed to comply with INDOT's behavioral expectations.

Daza's other alleged evidence of discrimination based on political affiliation meets a similar fate. Daza provides a long list of occurrences and simply assumes that they happened because he is a Democrat. But Daza does not present a single piece of evidence relevant to his political affiliation. *Cf. Brown*, 661 F.3d at 336. The evidence presented actually shows that management had taken issue with Daza's conduct for years, and the decision to fire him was made after his offensive comments during the December 1 training. So, Daza has failed to show that his political affiliation was a motivating factor in his firing.

All the evidence presented by Daza, viewed as a whole and in a light most favorable to Daza, fails to satisfy his burden of proving his alleged protected activities were a motivating factor in INDOT's decision to fire him. And because Daza has failed to meet his burden on the motivating-factor element—a necessity for political discrimination and retaliation claims—we need not address whether he carried his burdens to show that his defenses of Goff and discussion of his mother's letter to the editor are protected by the First Amendment and (for the retaliation claim) that he suffered a deprivation likely to deter free speech.

## III. CONCLUSION

Daza presented a long string of facts occurring over four years but presented no evidence that his alleged political activities or affiliation motivated his firing. So, Daza has failed to prove an element of his political retaliation and discrimination claims. The district court correctly granted summary judgment to the defendants on those claims. We therefore AFFIRM the judgment of the district court.