In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-2119

MATTHEW KING, individually and as
Representative of the Estate of
Bradley King, deceased,

*Plaintiff-Appellant,*

*v.*

HENDRICKS COUNTY COMMISSIONERS,
*et al.,*

*Defendants-Appellees.*

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:17-cv-04412-JRS-TAB — **James R. Sweeney, II**, *Judge.*

ARGUED JANUARY 9, 2020 — DECIDED MARCH 31, 2020

Before WOOD, *Chief Judge*, and EASTERBROOK and BARRETT,
*Circuit Judges*.

WOOD, *Chief Judge*. Bradley King, a 29-year-old resident of
Hendricks County, Indiana, who suffered from paranoid
schizophrenia, was killed by a police officer on November 29,
2016, during an encounter at his home. Two Hendricks

County reserve deputies went to the Kings' family home to perform a "welfare check" after Bradley called 9-1-1 and requested help. Matters then spun horribly out of control, though what precisely happened is disputed, aside from the fact that Bradley wound up dead. The only living eyewitnesses are the officers involved.

The evidence developed for purposes of the defendants' motion for summary judgment was as follows. The deputies, Jason Hays and Jeremy Thomas, testified that upon their arrival, Bradley came out of the house, walked toward them, and pulled a ten-inch knife out of his shorts pocket. Hays and Thomas backpedaled, drew their service firearms, and yelled at Bradley to stop and drop the knife. Bradley disregarded their commands and kept moving forward. Then, with the knife in his left hand, left arm raised in front of him so that the blade was pointing toward the officers, he started running at Hays. When Bradley was approximately eight feet away, Hays fired one shot. It proved to be fatal. According to the autopsy, the bullet grazed Bradley's left upper arm and entered his chest, directed "left to right, downwards, and slightly front to back." A large knife, which Bradley's father identified as one from the Kings' kitchen, was recovered from the ground near Bradley's left hand. An examination of the knife did not reveal any latent fingerprints.

Bradley's father, Matthew King, disputes the officers' account. He asserts that Bradley was never violent, even when suffering a psychotic episode, and would not have charged at the police with a knife. King urges that circumstantial evidence, including but not limited to the bullet trajectory, the lack of fingerprints on the knife, and the fact that Bradley was right-handed and thus probably would not have held the

knife in his left hand, substantially undermines the deputies' account. King contends that his son's killing was unwarranted and unlawful.

In the aftermath, King brought federal civil rights claims under 42 U.S.C. § 1983 against Hays, the Hendricks County Commissioners, the Hendricks County Sheriff's Department, and the Sheriff. He also brought federal claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act against the Commissioners and the Sheriff's Department, as well as state civil rights and tort claims. The district court granted summary judgment to all defendants on the federal claims and declined to exercise supplemental jurisdiction over the state-law claims. The court concluded that there was no genuine dispute of material fact for trial; that Hays's actions did not violate Bradley's rights under the Fourth Amendment; and that the institutional defendants did not violate the ADA and Rehabilitation Act. King appealed the district court's judgment on the federal claims, and we now affirm.

**I**

We review the district court's grant of summary judgment *de novo*. *Daza v. Indiana*, 941 F.3d 303, 308 (7th Cir. 2019). Summary judgment is appropriate when there is no dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). At the summary-judgment stage, we construe all facts in the record and reasonable inferences in the light most favorable to the nonmoving party. *Daza*, 941 F.3d at 308. But this does not extend to drawing inferences that are supported by only speculation or conjecture. *Id.* We may affirm summary judgment on any ground supported by

the record, as long as the parties adequately presented the issue before the district court and the nonmoving party had an opportunity to contest it. *De Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 558 (7th Cir. 2019).

## II

### A

King first asserts a claim against Hays individually under 42 U.S.C. § 1983 for a violation of Bradley's Fourth Amendment rights. Section 1983 authorizes private suits to redress deprivations of constitutional rights by state actors. The Fourth Amendment assures the right to be free from unreasonable "seizures," a category that includes a law enforcement officer's use of deadly force against a free citizen. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Whether use of deadly force constitutes a constitutionally reasonable seizure is an objective inquiry and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Other circuits have concluded that "the level of force that is constitutionally permissible in dealing with a mentally ill person," such as Bradley, "'differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community.'" *Gray v. Cummings*, 917 F.3d 1, 11 (1st Cir. 2019) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010)). "Consequently, a subject's mental illness is a factor that a police officer must take into account in determining what degree of force, if any, is appropriate." *Id.* (citing *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d

892, 900 (4th Cir. 2016); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004)); see also *Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018) ("These indications of mental illness create a genuine issue of material fact about whether the government's interest in using deadly force was diminished."). We agree with our colleagues that officers often should approach persons known or suspected to have a mental-health problem differently from the way they handle those whom they suspect of criminal activity.

But we also heed the Supreme Court's admonition that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97; see also *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018); *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 473 (7th Cir. 2015). "This is true even when, judged with the benefit of hindsight, the officers may have made 'some mistakes.'" *City & Cnty. of San Francisco, Cal. v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1775 (2015) (quoting *Heien v. North Carolina*, 574 U.S. 54, 61 (2014)).

"When addressing the use of deadly force, the court considers whether a reasonable officer in the circumstances would have probable cause to believe that the [person] poses an immediate threat to the safety of the officers or others." *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018). If the person of interest threatens the officer with a weapon, deadly force may be used, because the risk of serious physical harm to the officer has been shown. *Id*. This is so even if a less deadly alternative is available to the officers. *Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994). And this is so whether or not the

targeted person suffers from a mental illness—the critical con-
sideration is whether he or she poses an immediate threat to
the officers or others.

Here, there is a potential issue of fact. If we accept the de-
fendants' account of the critical events—that is, Bradley
pointed a large knife at them, disregarded their repeated com-
mands to drop the knife, and then charged at Hays—then
Hays's use of deadly force was constitutionally reasonable.
On the other hand, if Bradley did not pose an immediate
threat of serious harm to the officers, then deadly force was
unlawful. But the existence of a possible issue of fact does not,
by itself, prevent summary judgment. We must examine the
record to see whether King has proffered sufficient evidence
to permit a rational factfinder to find in his favor. See *Singer
v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). If so, then sum-
mary judgment is inappropriate, but if the opponent of sum-
mary judgment offers "only speculation or conjecture" that
raises a "metaphysical doubt," then there is no job for a fact-
finder to perform. *Id.*

Sadly, "the person most likely to rebut the officers' version
of events—the one killed—can't testify." *Cruz v. City of Ana-
heim*, 765 F.3d 1076, 1079 (9th Cir. 2014). To ensure fairness to
a deceased plaintiff whose representative alleges an imper-
missible use of deadly force, given the impossibility of victim
testimony to rebut the officers' account, we scrutinize all the
evidence to determine whether the officers' story is consistent
with other known facts. *Maravilla v. United States*, 60 F.3d
1230, 1233–34 (7th Cir. 1995); see also *Scott v. Henrich*, 39 F.3d
912, 915 (9th Cir. 1994), cert. denied, 515 U.S. 1159 (1995) ("In
other words, the court may not simply accept what may be a
self-serving account by the police officer. It must also look at

the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably."). If physical evidence contradicts the deputies' testimony, summary judgment is likely inappropriate. *Cruz*, 765 F.3d at 1078–80; see also *Capps v. Olson*, 780 F.3d 879, 884–85 (8th Cir. 2015).

King's theory is that Bradley presented no threat to the officers and the killing was unjustified. King contends that the officers planted the knife on Bradley after the fact and fabricated the story about his charging at Hays. In support of this theory, King pointed to the following evidence: (1) Bradley did not generally have a propensity for violence, even when he was having a "bad day" in terms of his mental health; (2) Bradley previously interacted with other police officers, and in one instance had a knife, but did not become violent on those occasions; (3) it is unlikely that Bradley would have carried a ten-inch kitchen knife in his shorts pocket, because his favorite knife was a small paring knife and he did not generally walk around with it; (4) while Hays and Thomas both stated in their depositions that Bradley held the knife in his left hand, and the knife was recovered from the ground near his left hand, Hays said in a prior statement that he thought Bradley might have held the knife in his right hand; (5) Bradley was right-handed and likely would not have held a knife in his left hand; (6) forensic testing of the knife by King's expert yielded no latent fingerprints; (7) the trajectory of the bullet indicates that Bradley was likely at an angle to Hays, whereas Hays testified that he shot him straight on and aimed for center mass; and (8) Deputy Thomas did not shoot at Bradley as Bradley was supposedly running at Hays.

We appreciate the difficulty King faces in countering the officers' testimony, but most of this evidence does not undermine the officers' account. King in the end is forced to rely on the theory that the officers shot Bradley for no reason and planted the knife on him. But the evidence supporting that version of events does not rise above speculation or conjecture. It creates only metaphysical doubt and requires us to make logical leaps rather than reasonable inferences. Some of King's evidence actually hurts, rather than helps, his case.

King's broad assertion that Bradley did not generally show an inclination toward violence does not negate the evidence that he behaved violently in this instance. King testified in his deposition that Bradley was "scared some of the time" and "that's where the knife thing came from." This supports the inference that Bradley may have pulled a knife on the officers if he felt threatened. Likewise, the fact that Bradley did not react violently in previous interactions with the police tells us nothing about whether he reacted violently this time. King's acknowledgment that Bradley had a knife on him in an earlier encounter with the police undermines the argument that it was out of character for Bradley to carry a knife around. Finally, King's theory that Bradley would not have been holding a kitchen knife because he preferred a different knife tells us very little. Even if we assume, favorably to King, that Bradley usually carried a small paring knife, that does not rule out the possibility that he found a larger knife in the family kitchen on the fateful day.

Next, despite King's claim that Bradley would not have carried a knife in his left hand because he was right-handed, the record evidence suggests that he had a large kitchen knife in his left hand. Hays and Thomas both testified to this effect

in depositions. Furthermore, the grazing wound to Bradley's left arm and the bullet trajectory in his body are consistent with his holding the knife in his left hand, up in front of his face, and leaning forward slightly, as the officers testified. It is also telling that after the shooting the knife was collected from the ground to Bradley's left.

King cannot make anything of the lack of fingerprint evidence: no evidence is no evidence. It is not affirmative evidence that contradicts the officers' testimony. We have previously warned in criminal cases that "successful development of latent prints on firearms is difficult to achieve." *United States v. Paladino*, 401 F.3d 471, 478 (7th Cir. 2005). "In reality, very few identifiable latent prints are found on firearms, a fact that has been discussed in both literature and the judicial system." *Id.* The same logic applies to knives used as weapons. And it is far too great a leap to infer from the lack of fingerprints on the knife that the police planted it after the shooting.

Finally, the fact that Thomas did not shoot Bradley does not help King's case. Bradley allegedly charged at Hays, not Thomas, and so it makes sense that Hays, not Thomas, would decide it was necessary to use his firearm in self-defense. From Thomas's failure to shoot we can reasonably infer that Thomas did not view Bradley as posing an imminent threat to him; we cannot, however, reasonably infer that Bradley did not pose an imminent threat to Hays.

We also note that there is no evidence that the officers planted the knife on Bradley after the fact, as King hypothesizes: nothing suggesting that the knife could not have fit inside the pocket from which the officers claimed Bradley pulled it; no prints on the knife; and no indication that the officers went inside the Kings' home.

Ultimately, we are left with substantial testimonial and physical evidence supporting Hays's version of events, and no concrete evidence rebutting it. King did not present enough evidence to raise a genuine dispute of fact for trial, and so summary judgment for Hays on the section 1983 claim was appropriate. In light of our ruling on the merits, we have no need to address Hays's back-up assertion that he was entitled to qualified immunity.

B

King also brings a section 1983 municipal liability claim against the Hendricks County Commissioners, the Sheriff's Department, and Sheriff Brett Clark (the Municipal Defendants).

In *Monell v. New York City Dep't Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court recognized that a local government may be liable for constitutional injuries resulting from its own actions or policies. *Id.* at 694. But it is premature for us to delve into the question of municipal liability until we are satisfied that a constitutional violation has been alleged and properly supported. See *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." (emphasis in original)).

As discussed above, King has not established facts sufficient to allow a fact-finder to conclude that Hays's use of deadly force violated Bradley's Fourth Amendment rights. There is thus no constitutional violation for which the institutional defendants and Sheriff Clark may be liable. Unlike in

the Eighth Amendment context, where we have said that an agency may be subject to *Monell* liability for deliberate indifference at the policy level to prisoners' serious medical needs even when its individual agents did not act with deliberate indifference, see *Glisson v. Indiana Dep't of Corrs.*, 849 F.3d 372, 378 (7th Cir. 2017), a government entity cannot passively commit a Fourth Amendment violation. This is the case even if we accept, for purposes of argument, King's assertion that Hendricks County fails to give reserve police officers such as Hays and Thomas adequate training in how to deal with the mentally ill and how to de-escalate situations so that the use of deadly force can be avoided. Even supposing that the county would have been better advised to respond to persons experiencing mental-health crises with medical personnel or social workers, rather than armed police officers, its failure to do so does not automatically lead to liability. For liability to attach, there must be an unreasonable search or seizure, not just negligence or a failure to choose the best option.

Because there was no underlying Fourth Amendment violation, summary judgment for the Municipal Defendants on the section 1983 claim against them was proper.

### III

Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "qualified individual" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, … or the provi-

sion of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2). A "public entity" includes "any State or local government," or "any department, agency, special purpose district, or other instrumentality of a State or States or local government." *Id.* § 12131(1). The parties do not dispute that Bradley was a qualified individual or that the Hendricks County Commissioners and the Sheriff's Department are public entities covered by the statute.

Claims under section 504 of the Rehabilitation Act are treated as "functionally identical" and can be considered together with Title II claims. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). For simplicity, we refer to Title II and section 504 collectively as "Title II" in the following analysis.

Whether Title II applies to law enforcement investigations and arrests, and if so to what extent, is an open question in this circuit. Our fellow circuits are split. Compare *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000) ("Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life.") with *Vos*, 892 F.3d at 1036 ("Title [II] applies to arrests."); *Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 339 (4th Cir. 2012) ("Having concluded that the ADA applies to the investigation of criminal conduct, we next consider whether the deputies' conduct was reasonable under the circumstances."); *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1085 (11th Cir. 2007) ("[T]he question is not so much one of

the applicability of the ADA because Title II prohibits discrimination by a public entity by reason of [a person's] disability. The exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance."); and *Gohier v. Enright*, 186 F.3d 1216, 1221 (10th Cir. 1999) ("[A] broad rule categorically excluding arrests from the scope of Title II … is not the law."). Most recently, the First Circuit assumed without deciding that Title II applies to police encounters. *Gray*, 917 F.3d at 17 ("For present purposes, it is sufficient for us to assume … that Title II of the ADA applies to ad hoc police encounters … and that exigent circumstances may shed light on the reasonableness of an officer's actions.").

The Supreme Court granted *certiorari* to decide this issue in *City & Cnty. of San Francisco, Cal. v. Sheehan*, *supra*, but it dismissed the question as improvidently granted after San Francisco changed its argument after the Ninth Circuit's decision and before the Supreme Court could rule. 135 S. Ct. at 1773–74 ("Our decision not to decide whether the ADA applies to arrests is reinforced by the parties' failure to address a related question: whether a public entity can be liable for damages under Title II for an arrest made by its police officers. Only public entities are subject to Title II, and the parties agree that such an entity can be held vicariously liable for money damages for the purposeful or deliberately indifferent conduct of its employees. But we have never decided whether that is correct." (internal citations omitted)).

Like the First Circuit in *Gray*, we may assume without deciding that Title II applies to the officers' interaction with Bradley. We also may assume that Hendricks County could

be held vicariously liable under Title II for Hays's actions, and that "deliberate indifference" is the appropriate standard by which to analyze the institutional defendants' conduct. No matter, because in order to prevail on his claims King must show that "'but for' [Bradley's] disability, he would have been able to access the services or benefits desired." *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 754 (7th Cir. 2006). King's evidence falls short on that critical point.

The police responded promptly to Bradley's call for assistance, and there is no competent evidence contradicting Hays's account that he shot Bradley because Bradley ran at him with a knife. We have been given no reason to believe that Hays's response would have been different had someone not suffering from a mental illness done the same thing, and King does not propose anything that Hays should have done differently to accommodate Bradley's mental illness. Hays's "failure to disarm, or take the decedent under control, was not because he was inadequately trained to deal with disabled individuals, but because the decedent threatened him with a deadly weapon before he could subdue him." *Thompson v. Williamson Cnty., Tenn.*, 219 F.3d 555, 558 (6th Cir. 2000). "Thus, if the decedent was denied access to medical services it was because of his violent, threatening behavior, not because he was mentally disabled." *Id.*

Furthermore, King's claims about Hendricks County's alleged supervisory failures lack specificity. He calls for "additional training, oversight, and policy guidance," but does not say what Hendricks County should train all officers to do when they interact with people suffering from mental illnesses (of which there are a great variety and which involve countless different symptoms). What training should Hays

have received that, if he acted in accordance with it, would have prevented Bradley from running at Hays with a knife? King has no direct answer for this, but rather points to a previous encounter Bradley had with the police in which the officers were able to get him to drop the knife he was carrying and called an ambulance to take him to the hospital. But it is possible that Hays acted identically to the officers in the previous encounter, and the only thing that differed was Bradley's response.

Bradley's death at the hands of police officers whom he called for help when he was suffering a mental-health crisis is undoubtedly heartbreaking for his family, as well as a sobering reminder about the difficulties of dealing with the mentally ill. Nonetheless, the record before us does not indicate that Hays was deliberately indifferent to Bradley's disability or that Hendricks County was deliberately indifferent to the needs of community members suffering from mental illness and failed adequately to train officers in how to handle such persons. Finally, there is no evidence that but for alleged discrimination on the basis of his disability, Bradley would still be alive.

We therefore conclude that the district court did not err in granting summary judgment to the defendants on the ADA and Rehabilitation Act claims.

## IV

We AFFIRM the district court's judgment in all respects.