In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――――――

No. 25-1750

RUSSIA BROWN,

*Plaintiff-Appellant,*

*v.*

CHICAGO TRANSIT AUTHORITY and AMALGAMATED TRANSIT
UNION, LOCAL 241,

*Defendants-Appellees.*

―――――――――――

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 22-cv-675 — **Georgia N. Alexakis**, *Judge.*

―――――――――――

ARGUED MAY 14, 2026 — DECIDED JUNE 24, 2026

―――――――――――

Before RIPPLE, SCUDDER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Russia Brown took leave from work
on two dozen occasions without properly informing his em-
ployer, the Chicago Transit Authority (the "CTA"). The CTA
then terminated Brown notwithstanding his union's objec-
tions. Brown subsequently filed suit against the CTA and the
union, alleging transgender discrimination and retaliation
under Title VII of the Civil Rights Act as well as violations of

the Family and Medical Leave Act ("FMLA"). Because Brown failed to show evidence supporting his claims, we affirm the district court's grant of summary judgment to the CTA and to the union.

## I. Background

The CTA hired Russia Brown in 2016 as a bus operator, and Brown enjoyed representation by a union, Amalgamated Transit Union, Local 241.[1] Brown historically identified as a woman, but by 2017 he began identifying as a man. During his transition, he asked a union representative to clarify the CTA's bathroom policy. That union representative referred him to a CTA manager, Gregory Middleton. Brown met with CTA management and learned he could use whichever bathroom he wanted. According to Middleton, union president Keith Hill spoke to Middleton and compared Brown's request to an employee seeking accommodation for a disability.

The following year, Brown asked a union representative about insurance coverage for a procedure relevant to his transition that his CTA insurance plan denied. The union representative rebuffed Brown's request for help. Brown then engaged the American Civil Liberties Union to pressure the CTA to expand its insurance coverage, and shortly thereafter the CTA expanded its insurance coverage to include the procedures Brown needed.

Also in 2018, Brown experienced online harassment from fellow employees. The harassment did not explicitly reference Brown's transgender identity, but Brown reported the

---

[1] As the summary judgment standard requires, we recount these facts in the light most favorable to Brown, the non-moving party.

harassment to a union representative. Brown related the incident to the CTA's Equal Employment Opportunity Unit, but he did not file a grievance with the union.

Two years later, in June 2020, Brown began reporting to a new work location at a garage on the south side of Chicago. Shortly after this transfer, Brown encountered Hill, the union president, at the garage. In comments Hill recalled as warning Brown that passengers on the south side of Chicago can be more aggressive, Hill told Brown, "all that bitchin you been doing ain't going to cut it down here. You're out south now."

Around that period, on June 9, Brown applied for intermittent leave under the FMLA for "random back pains" not related to his gender identity. The FMLA entitles qualifying employees up to twelve weeks of unpaid leave per year, *see* 29 U.S.C. § 2612(a), and an employee may use leave intermittently when medically necessary, *see* § 2612(b)(1).

The CTA uses a third-party, ReedGroup, to administer FMLA leave for its employees. ReedGroup both manages the FMLA application process and tracks employees' use of their allotment of intermittent leave. Because ReedGroup tracks employees' use of leave, an employee who wants to use his leave on a given day is required to first request that leave through ReedGroup. An employee may afterwards inform his work location of his absence and use of FMLA leave. The CTA and the union related this requirement to employees, and when Brown had previously enjoyed FMLA leave he complied with this reporting requirement. If an employee only reported his use of FMLA leave to his work location, the employee would enjoy an absence from work without detracting from his available leave—conduct the CTA considers falsification of FMLA leave. To ensure compliance, the CTA asked

managers to cross-reference ReedGroup records with work location records.

Brown heard back from ReedGroup the same day he applied for leave. Specifically, ReedGroup requested medical certification to support Brown's application. Brown could obtain this initial medical certification from a healthcare professional of his choosing. Depending on the certification the applicant provides, ReedGroup sometimes requires a second medical opinion from a medical provider it selects. And if the first and second medical opinions disagree, ReedGroup may require a third medical opinion from a specialist jointly approved by the employee and the CTA. The FMLA outlines this process. *See* 29 U.S.C. § 2613(c)–(d).

Brown submitted a medical certification from a chiropractor attesting to Brown's qualification for intermittent FMLA leave. ReedGroup was familiar with the chiropractor, because he had submitted FMLA certifications for CTA employees with unusual frequency and often opined outside of his specialty. Consistent with its general practice when it received certifications from that chiropractor, ReedGroup requested Brown obtain a second medical opinion.

In July 2020, Brown met with an orthopedist to obtain a second medical opinion. The orthopedist concluded that Brown was not qualified for FMLA leave.

To resolve the disagreement between the two medical opinions, ReedGroup's vendor sent Brown a letter with instructions on scheduling an appointment to obtain a third medical opinion. The vendor also called Brown to set up the appointment. Brown did not respond. If an employee is uncooperative in obtaining a third opinion, ReedGroup relies on

the second opinion. Eventually, in December 2020, Reed-Group deferred to the second medical opinion and denied Brown's application for FMLA leave.

As Brown's FMLA application languished, Brown called in FMLA absences to his work location without reporting them to ReedGroup. By October 2020, Brown had accumulated twenty-four days in which he reported FMLA leave to his work location without contacting ReedGroup. That month, a business manager at Brown's work location, Wilmer DeJesus, noticed the discrepancy between CTA and Reed-Group records on Brown's FMLA-related absences and contacted ReedGroup to confirm Brown failed to properly report his use of FMLA leave. DeJesus also noted that when Brown previously used FMLA leave he had properly reported his absences. A CTA manager took Brown out of service, and, in a meeting with DeJesus the following day, Brown could not explain why he had failed to report his FMLA leave to Reed-Group. DeJesus therefore recommended to his supervisor that Brown be discharged for falsification.

Brown worked with the union to stave off discharge. He spoke multiple times with Hill and union representatives about keeping his job. Brown sought extra time to contest his dismissal and asked a union representative to request a "notice of further investigation," which suspends the general requirement that the CTA take disciplinary action within ten days of notifying an employee of misconduct. After union representatives met with CTA management, the CTA agreed to issue such a notice for Brown.

Brown also sought a "last chance agreement," which permits an employee to avoid discharge by instead entering a form of probationary reinstatement. Hill requested CTA

management grant Brown such an agreement. The CTA rebuffed this request.

A CTA official recalled that in a conversation with Hill during this period, Hill mentioned Brown had come to the union's offices and acted "braggartly" by expressing "that he wasn't working and that CTA couldn't do anything to him as a result."

On January 7, 2021, DeJesus's supervisor, Arlana Johnson, discharged Brown for falsification; her letter recited Brown's twenty-four absences and his failure to report them to Reed-Group. Around that time, CTA management at Brown's garage discharged four other bus operators for FMLA falsification, none of whom were transgender. Hill was similarly unsuccessful in persuading the CTA to offer those employees a last chance agreement.

Brown worked with the union to challenge his termination. Union officials helped Brown submit to the CTA a grievance for wrongful discharge. Hill, unaware of the grievance, wrote in an email to Brown two days later, "Can you come in or meet with your Rep to file a grievance that is your next step and you can add all your supporting information to the grievances." After the CTA denied Brown's grievance, the union sent a letter signed by Hill requesting arbitration for Brown's grievance, along with twenty-six others. The union also filed a class action grievance challenging the FMLA-related suspension and discharge of employees, including Brown.

Brown's grievance has remained in a backlog of grievances pending arbitration that are addressed chronologically, with 184 pending discharge grievances as of January 2023. Grievances preceding Brown's include those from seven

employees discharged for FMLA falsification in the months preceding Brown's termination. The union's class action grievance is also pending arbitration.

In April 2021, Brown filed discrimination charges against the union and the CTA with the Equal Employment Opportunity Commission. After receiving notice of his right to sue, Brown brought suit against the CTA and the union. Against both parties, he claimed gender identity-based discrimination and retaliation under Title VII. Against the CTA alone, he brought interference and retaliation claims under the FMLA as well as a claim for municipal liability on the grounds that the CTA's sex-based discrimination violated the Equal Protection Clause.

Ultimately, the district court granted the defendants' motions for summary judgment and entered judgment in their favor in two separate opinions. The court concluded Brown failed to produce evidence from which a reasonable trier of fact could find in his favor on any of his claims. Brown's lack of evidence, the court noted, stemmed in part from his failure to properly present supporting evidence through filings under Local Rule 56.1. Brown appeals.

## II. Discussion

Before we reach the merits of the district court's summary judgment rulings, we resolve Brown's challenges to the scope of evidence the court considered. These concern the court's conclusions that Brown violated Local Rule 56.1 and that some evidence Brown advanced was inadmissible. We review both rulings for an abuse of discretion. *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 630 (7th Cir. 2009).

We begin with Brown's violations of the local rules. Brown asserted facts in summary judgment filings without supportive, on-point citations, and claims the district court should have reviewed the record itself for proper substantiating evidence rather than ignore his factual assertions. We disagree.

Properly substantiating assertions is a basic legal obligation. Doing so takes on a particular form and importance for the plaintiff at summary judgement. "Summary judgment is the 'put up or shut up' moment in litigation." *Delapaz v. Richardson*, 634 F.3d 895, 900 (7th Cir. 2011) (citing *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010)). This stage asks a court to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). As part of this inquiry, Brown had the burden to "designate specific facts showing that there is a genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

Federal and local rules enforce a substantiation requirement. The Federal Rules of Civil Procedure require that on a motion for summary judgment, a party asserting a fact "must support the assertion" with citation "to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1), without which the court may "consider the fact undisputed for purposes of the motion," *id.* (e)(2). The relevant local rule echoes this requirement. It instructs that absent a citation to "specific evidentiary material," the court may "disregard" a factual assertion or "deem[] admitted" the fact the party purports to dispute. N.D. Ill. L.R. 56.1(d)(2), (e)(3).

Brown does not contest his citation practices violated the local rules. Instead, Brown argues the court used minor citation errors as a "technical trap" to justify ignoring the evidentiary record. These contentions misunderstand the court's decision and Brown's own responsibility to properly present facts negating summary judgment.

First, Brown asserts the district court's order was disproportionate because it "declared global non-compliance" so as to disregard any record evidence supporting his claims, including evidence to which he properly cited.

This is wrong. The district court disregarded Brown's responses and assertions only "where Brown has failed to comply with the[] rules." Contrary to the "global" exclusion Brown claims, the district court addressed each instance in which it would not accept Brown's dispute of a factual assertion and provided a sound explanation for its decision. Nor did the district court disregard his properly substantiated factual assertions. In fact, the court incorporated Brown's supported facts into its analysis and at one point sua sponte located possible record evidence that might support Brown's factual assertion notwithstanding his failure to provide a relevant citation. The district court's response was tailored, not disproportionate.

Brown misunderstands his burden to properly present evidence in arguing the district court ignored supportive record evidence to which he did not cite. As we have explained, "[i]t is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." *Harney v. Speedway Super-America, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (citing

*Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996)). The Federal Rules of Civil Procedure reflect this allocation of responsibility by providing that "[t]he court need consider only the cited materials …." Fed. R. Civ. P. 56(c)(3).

This principle is particularly salient in employment discrimination cases, where litigation is "extremely fact-intensive," and the court cannot be made to play "a game of hunt the peanut." *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) (quoting *Greer v. Bd. of Educ. of Chi.*, 267 F.3d 723, 727 (7th Cir. 2001)). Or to draw on another metaphor we have frequently invoked, "[j]udges are not like pigs, hunting for truffles buried [in the record]." *Gross v. Cicero*, 619 F.3d 697, 702 (7th Cir. 2010) (second alteration in original) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

With Brown's misunderstandings resolved, what remains is Brown's recognition his filings violated Local Rule 56.1 and that district courts have the discretion to strictly enforce local rules. *See Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 956 (7th Cir. 2021) (quoting *Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011)). The court's enforcement of Local Rule 56.1 was well within its discretion.

We next turn to the court's more conventional evidentiary ruling. Brown argues the court erred by excluding as hearsay three statements that he argues were admissible as statements of a party-opponent. *See* Fed. R. Evid. 801(d)(2). The three statements are: 1) Middleton's testimony he heard Hill compare Brown to a disabled driver, 2) Lunde's testimony Hill told her Brown had acted "braggartly," and 3) Hill's comments on health insurance in an online video.

Brown's argument cannot succeed because he challenges a phantom ruling. The three statements he identifies were not at issue in the district court's evidentiary ruling, which concerned other statements Brown does not reference in his opening brief. In fact, the court discussed the first two statements Brown identifies in its assessment of whether Brown's evidence showed a genuine dispute for trial. And Brown did not raise the third statement he identifies in his briefing opposing summary judgment.

True, even if the district court did not exclude Hill's comments in the online video, it did exclude testimony from Middleton characterizing Hill's comments. Yet Brown made clear in his opening brief that he sought the admission of Hill's statement itself—the statement the district court never excluded. Nor is Brown able to overcome this error by raising the court's exclusion of Middleton's testimony in his reply brief, as Brown waived the claim by failing to raise it in his opening brief. *See Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023).

With the evidentiary issues aside, we now turn to the district court's entry of judgment on Brown's claims. "We review a district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the non-moving party." *Tackett v. Dauss*, 132 F.4th 1026, 1030 (7th Cir. 2025) (citing *Trahanas v. Northwestern Univ.*, 64 F.4th 842, 852 (7th Cir. 2023)). "Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting *Trahanas*, 64 F.4th at 852). "[T]he moving party may succeed by showing an absence of evidence to support the non-moving party's claims." *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir.

2020) (quoting *Parkey v. Sample*, 623 F.3d 1163, 1165 (7th Cir. 2010)). Additionally, "generalized and unsupported allegations cannot create a genuine dispute." *Anderson v. Mott St.*, 104 F.4th 646, 651 (7th Cir. 2024).

**A. Claims Against the CTA**

We first address Brown's claims against the CTA, beginning with his Title VII claims.

**1. Title VII Discrimination**

Under Title VII of the Civil Rights Act of 1964, it is "unlawful … for an employer … to discharge any individual, or otherwise to discriminate against any individual … because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title VII's scope covers an employer's discriminatory action against a transgender employee because sex plays a "necessary and undisguisable role in th[at] decision." *Bostock v. Clayton County*, 590 U.S. 644, 652 (2020).

At summary judgment, the court ultimately considers whether the evidence as a whole "would permit a reasonable factfinder to conclude that the plaintiff's … sex … caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *accord Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 760 (7th Cir. 2022). "To help answer this question, a plaintiff may," as Brown does here, "invoke the well-known *McDonnell Douglas* burden-shifting framework." *Saud v. DePaul Univ.*, 154 F.4th 563, 567 (7th Cir. 2025); *see Anderson*, 104 F.4th at 652 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Under the *McDonnell Douglas* framework, Brown must make out the four elements of a prima facie case: "(1) he is a

member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (quoting *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022)). If a plaintiff supports a prima facie case, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action," after which "[t]he burden then shifts back to the employee to show why the employer's explanation is pretextual." *Saud*, 154 F.4th at 567 (quoting *Lewis*, 36 F.4th at 760). Given the potential for issues across stages to overlap, we may, as we do here, "run through that analysis only once," with our "true goal" in mind of determining whether the evidence as a whole would permit a reasonable factfinder to conclude Brown's gender identity caused his termination. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 574 (7th Cir. 2021); *see Upchurch v. Indiana*, 146 F.4th 579, 587–88 (7th Cir. 2025).

The district court concluded Brown failed to show a valid comparator and that the CTA had legitimate, nondiscriminatory, and nonpretextual reasons for terminating Brown. Brown presses his showing of a valid comparator and pretext on appeal, but his arguments do nothing to undermine the district court's sound reasoning.

We begin with the valid comparator. Under that prong, a plaintiff must produce evidence from which a reasonable factfinder could conclude "another similarly situated employee who wasn't in the protected class was treated better by the [employer]." *Marshall v. Indiana Dep't of Corr.*, 973 F.3d 789, 791–92 (7th Cir. 2020). That comparator "must be directly

comparable to the plaintiff in all material respects," *Anderson*, 104 F.4th at 653 (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)), something a plaintiff typically shows through evidence the comparator fell under the same supervisor, was subject to the same standards, and engaged in similar conduct without differentiating circumstances, *id.* (quoting *Coleman*, 667 F.3d at 847).

Brown claims he identified other bus operators accused of FMLA reporting violations who were not discharged. Yet, as below, he never identifies those comparators or shows they qualify as comparable. Instead, he cites the same statement of fact the district court deemed inadequate. All that statement provided to support a valid comparator was: "Alisha Latham Hill issued a last chance agreement for Operator Winston." As the district court noted, this was insufficient because it omits critical information required for a jury to find "Operator Winston" as a valid comparator, including whether Winston is transgender and whether Winston committed FMLA reporting violations.

We also agree with the district court's finding that the CTA had legitimate, nondiscriminatory, and nonpretextual reasons for terminating Brown. Brown argues that the CTA used his twenty-four absences as pretext to conceal its discriminatory motive for firing him. To support this, he claims the CTA "cancelled" his third medical examination and that DeJesus flouted a CTA policy requiring he reconcile FMLA absences on a weekly basis. But the district court correctly rejected both claims right out of the gate because Brown failed to point to record material supporting either assertion. Specifically, his assertions either failed to cite to the record at all or pointed to

irrelevant testimony. Nor does Brown remedy this deficiency on appeal.

Brown marshals some record evidence, but it does not support a reasonable inference that the CTA's "explanations are a pretext for the prohibited animus." *Chatman v. Bd. of Educ. of Chi.*, 5 F.4th 738, 747 (7th Cir. 2021) (quoting *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 740 (7th Cir. 2013)). "Pretext is '[a] lie, specifically a phony reason for some action….'" *Upchurch*, 146 F.4th at 587 (alteration in original) (quoting *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 892 (7th Cir. 2025)). Brown notes that CTA guidelines included as examples of conduct supporting serious discipline, "making untrue, dishonest or misleading reports (falsification)." Brown claims this sets out an intent requirement the CTA failed to meet in discharging him. But this presents an argument merely asserting "faulty reasoning or mistaken judgment on the part of the employer," *id.* (quoting *Napier*, 137 F.4th at 892), not an argument the CTA's reasoning was disingenuous, as required to support pretext. The pretext standard similarly disposes of Brown's attention to DeJesus transcribing the twenty-four dates on which Brown violated CTA policies on an outdated FMLA form. Brown does not explain how DeJesus's use of this form undermines those violations as sincerely motivating the CTA's decision to discharge him.

Brown's case fails under *McDonnell Douglas*, and though he claims the result is different if we assess his evidence in aggregate, we disagree. Brown fails to provide evidence supporting a reasonable inference the CTA fired him because of his gender identity.

Sex-based discrimination also forms the basis of Brown's claim for municipal liability under the Equal Protection

Clause, which is subject to the same standard as his Title VII claim. *See Word v. City of Chicago*, 946 F.3d 391, 397 n.4 (7th Cir. 2020). Therefore, Brown's failure to support a discrimination claim under Title VII disposes of his claim for municipal liability based on the CTA's actions.

### 2. Title VII Retaliation

Brown also claims that the CTA fired him because of his advocacy for transgender employees. "Title VII prohibits employers from discriminating against an employee 'because he has opposed any practice made an unlawful employment practice by this subchapter ….'" *Igasaki*, 988 F.3d at 959 (quoting 42 U.S.C. § 2000e-3(a)). To survive summary judgment, Brown must show evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Abebe v. Health and Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022) (quoting *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 404 (7th Cir. 2007)).

Ultimately, we consider the evidence as a whole and the "inquiry comes down to one question: 'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused' the materially adverse action?" *Lesiv v. Illinois Cent. R.R.*, 39 F.4th 903, 911 (7th Cir. 2022) (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)).

The parties do not dispute Brown satisfied the first element through his bathroom inquiry in 2017 and his campaign for broader insurance coverage in 2018. Nor do they dispute Brown's 2021 discharge constituted a materially adverse action. In ruling against Brown, the district court found he

lacked evidence of a causal connection between his advocacy and his discharge, and in doing so noted the long temporal gap and undisputed evidence the decisionmaker over Brown's discharge, Arlana Johnson, was not aware of his past advocacy. *See Anderson*, 104 F.4th at 655 ("The decisionmaker … must be aware of the protected activity to establish a causal connection.").

Brown attempts to dispute Johnson's status as the relevant decisionmaker and instead asserts that the same people who opposed his protected activity participated in the investigation leading to his discharge. But Brown never identifies those people and provides no citations to substantiate his assertion. So, like the district court, we reject empty assertions offered to support a triable issue of fact.[2] *See id.* at 651.

What remains is Brown's claim that the timing of events creates a reasonable inference the CTA fired him because of his protected activity. Recognizing the difficulty of this inference from a multi-year gap, Brown seeks to shrink this period to six months given comments from union president Hill at the CTA garage warning Brown that he had to stop "bitchin." How this relates to an inference the CTA acted with a retaliatory motive, however, Brown does not explain—a critical link. *See Scaife v. Cook County*, 446 F.3d 735, 741 (7th Cir. 2006) ("When a plaintiff offers an employer's stray remark in a

---

[2] We note that the Federal Rules of Appellate Procedure impose on Brown an obligation to include in his brief "citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(8)(A). Counsel's citation practices on appeal and before the district court should serve as a reminder of the importance of adequately substantiating assertions made to a court.

discrimination case, it is necessary to demonstrate 'some nexus' between the remark and the challenged employment decision."), *overruled on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013).

In any event, Brown ventures on weak ground in relying on timing alone. We have indicated suspicious timing alone as either "rarely enough to create a triable issue," *Igasaki*, 988 F.3d at 959 (quoting *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009)), or as simply "not enough," *Abebe*, 35 F.4th at 608.

But we need not resolve any tension in our caselaw on this point because Brown is far from benefitting from even the more permissive rule. Where we have accepted the possibility of timing in supporting an inference of causation, we indicated this extends to "no more than a few days … between the protected activity and the adverse action." *Igasaki*, 988 F.3d at 959 (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012)). Even if we considered a six-month gap, that would be far from "a few days."

Here, the multi-year gap between Brown's protected activity and his firing is far from "suspicious," and the "substantial time lapse between [the] protected activity and the adverse action is counter-evidence of any causal connection." *Goetzke v. Ferro Corp.*, 280 F.3d 766, 775 (7th Cir. 2002) (quoting *Johnson v. Univ. of Wis.–Eau Claire*, 70 F.3d 469, 480 (7th Cir. 1995)). This temporal gap alone does not provide a reasonable inference of causation. Brown fails to present any additional evidence that could support a causal link. As we have explained, "[i]f the best a plaintiff can do is allege that he engaged in protected activity and then, years later, the employer took an adverse action against him, the claim may not be

permitted to proceed." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014).

### 3. FMLA Interference and Retaliation

We next turn to Brown's claims that the CTA interfered with the exercise of his rights under the FMLA and retaliated against him for exercising those rights. We affirm the district court's grant of summary judgment to the CTA on both claims because, as above, Brown fails to show any error in the district court's reasoning.

We begin with FMLA interference. Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C. § 2615(a)(1). The district court rested its decision on Brown's failure to show needed evidence he "was entitled to leave under the FMLA," *Hickey v. Protective Life Corp.*, 988 F.3d 380, 387 (7th Cir. 2021) (quoting *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)), because Brown did not complete the required third medical assessment. And federal regulations provide that "[i]f the employee does not attempt in good faith to reach agreement [on a third health care provider], the employee will be bound by the second certification." 29 C.F.R. § 825.307(c) (2026).

Brown claims this was wrong because the CTA "obstructed" him from obtaining the third medical opinion by ceasing communication with him before ultimately cancelling his appointment. The district court addressed Brown's claim he repeatedly communicated his difficulty scheduling the third appointment, but found the statements inconsistent with the evidentiary material Brown cited. And because those assertions were responses to the CTA's properly

substantiated assertions that it had informed Brown by mail and telephone of the procedures for scheduling a third medical appointment, communications to which Brown failed to timely respond, the court deemed those statements admitted.

On appeal, Brown provides no substantiation for most of his assertions, including that the CTA cancelled his appointment. He therefore does not show that he produced the evidence he describes. And the two assertions for which Brown does include citations make no difference. One references a statement of fact indicating Brown called to schedule a third appointment *after* his months of inaction led to the CTA's use of the second opinion finding Brown did not qualify for intermittent leave. The other relies on a statement of fact the court deemed admitted indicating Brown had not responded to efforts to schedule a third appointment.

Brown also argues on appeal that the CTA retaliated against him for exercising his rights under the FMLA. In doing so, he ignores the district court's ruling that he forfeited this claim by failing to develop it in his briefing. Therefore, Brown presents no grounds for upsetting the district court's ruling. *See Anderson v. United Airlines, Inc.*, 140 F.4th 385, 389 (7th Cir. 2025) ("Because Plaintiffs' appeal does not engage with the district court's finding of forfeiture, we affirm the reasoning of the district court.").

## B. Claims Against the Union

Having resolved Brown's claims against the CTA, we now turn to Brown's claims against the union. He contends that the union discriminated against him because of his transgender identity and that the union retaliated against him for protected activity. He brings both claims under Title VII.

### 1. Title VII Discrimination

Title VII "applies to unions as well as to employers." *Green v. Am. Fed'n of Tchrs./Illinois Fed'n of Tchrs. Loc. 604*, 740 F.3d 1104, 1104 (7th Cir. 2014) (citing 42 U.S.C. § 2000e-2(c)). A union violates Title VII's bar on discrimination when "it discriminates in the performance of its agency function." *E.E.O.C. v. Pipefitters Ass'n Loc. Union 597*, 334 F.3d 656, 659 (7th Cir. 2003); *accord Maalik v. Int'l Union of Elevator Constructors, Loc. 2*, 437 F.3d 650, 652 (7th Cir. 2006); *see Green*, 740 F.3d at 1107.

The district court found Brown failed to create a genuine issue of material fact as to whether the union treated Brown differently. *See Bostock*, 590 U.S. at 681 ("As used in Title VII, the term '"discriminate against"' refers to 'distinctions or differences in treatment that injure protected individuals.'" (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006))). The court therefore did not reach whether the union's actions were materially adverse or were motivated by Brown's gender identity.

Brown claims the union took adverse action against him by failing to request a last chance agreement or file a grievance. But Brown makes the same error on appeal he made below: none of the citations he provides indicate the union declined to file a grievance or request a last chance agreement.

Brown seems to argue that Hill's description of him as "braggartly" constituted an adverse action insofar as it "reinforced" the CTA's prior decision to terminate him. This theory impliedly asks us to recognize both that a comment itself can constitute an adverse action and conclude that the comment was "materially harmful" to Brown. *See Burlington*, 548 U.S. at 68. But we need not reach these issues because Brown never

raised this comment in advancing his Title VII discrimination claim against the union below, much less identified the comment as an adverse action. Brown thereby waived his argument. *See Bradley*, 59 F.4th at 897.

### 2. Title VII Retaliation

Brown also claims that Hill's description of him as "braggartly" to a CTA official constituted unlawful retaliation for his past advocacy.

Title VII makes it unlawful "for a labor organization to discriminate against any member … because he has opposed any practice made an unlawful employment practice by this subchapter." § 2000e–3(a). To survive summary judgment on a Title VII retaliation claim, a plaintiff "must show evidence of '(1) a statutorily protected activity; (2) a materially adverse action taken by the [labor organization]; and (3) a causal connection between the two.'" *Abebe*, 35 F.4th at 607 (quoting *Humphries*, 474 F.3d at 404). To meet the causation prong, a plaintiff must show "that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

The district court rested its rejection of this claim mainly on the basis that Brown failed to show evidence from which a reasonable jury could infer Hill would not have made the "braggartly" comment but-for Brown's prior advocacy. We agree.

Brown argues on appeal that the "close temporal proximity and coordinated conduct" of Hill's comments and De-Jesus's October 2020 audit "link[] the Union's president directly to the employer's adverse action." Brown thus switches to identifying CTA actions rather than Hill's "braggartly"

comment as the retaliatory conduct by the union. But even if this claim were cognizable and not waived, Brown points to no evidence of "coordinated conduct" supporting this inference. And even if Brown could shrink a two- to three-year gap between protected activity and the allegedly adverse action to months, the monthslong gaps persists; Brown still would not present a gap close to "no more than a few days." *Igasaki*, 988 F.3d at 959 (quoting *Kidwell*, 679 F.3d at 966). We agree with the district court that this was not enough to support a reasonable inference of causation.

*      *      *

The judgment of the district court is

AFFIRMED.